[No. F044943. Fifth Dist. Dec. 13, 2004.]

BAKERSFIELD CITIZENS FOR LOCAL CONTROL, Plaintiff and Appellant, v.
CITY OF BAKERSFIELD, Defendant and Respondent;
PANAMA 99 PROPERTIES LLC, Real Party in Interest and Respondent.

[No. F045035. Fifth Dist. Dec. 13, 2004.]

BAKERSFIELD CITIZENS FOR LOCAL CONTROL, Plaintiff and Appellant, v.
CITY OF BAKERSFIELD, Defendant and Respondent;
CASTLE & COOKE COMMERCIAL-CA, INC., Real Party in Interest and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

---

\*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts VII, VIII and IX.

1186

**COUNSEL**

Herum Crabtree Brown, Steven A. Herum and Brett S. Jolley for Plaintiff and Appellant.

Jones & Beardsley, Mark A. Jones, Craig N. Beardsley and Christopher Finberg for Real Party in Interest and Appellant Castle & Cooke California, Inc.

Virginia Gennaro, City Attorney; Hogan Guiney Dick and Michael M. Hogan for Defendant and Respondent.

Gresham Savage Nolan & Tilden, John C. Nolan and Jennifer M. Guenther for Real Party in Interest and Respondent.

Opinion

**BUCKLEY, Acting P. J.—**

## INTRODUCTION

Appellant Bakersfield Citizens for Local Control (BCLC) has challenged ·development of two retail shopping centers in the southwestern portion of the City of Bakersfield (City), alleging violations of the California Environmental Quality Act (CEQA). The shopping centers are located 3.6 miles apart.[1] When complete, they will have a combined total of 1.1 million square feet of retail space. Each shopping center will contain a Wal-Mart Supercenter (Supercenter) plus a mix of large anchor stores, smaller retailers, and a gas station. An environmental impact report (EIR) was prepared and certified for each project.

In these consolidated appeals we are called upon to assess the sufficiency of the EIR's. In the published portion of this opinion, we first determine that BCLC has standing, that it exhausted its administrative remedies and that the appeals are not moot. We then explain that the EIR's do not fulfill their informational obligations because they failed to consider the projects' individual and cumulative potential to indirectly cause urban/suburban decay by precipitating a downward spiral of store closures and long-term vacancies in existing shopping centers. Furthermore, the cumulative impacts analyses are defective because they did not treat the other shopping center as a relevant project or consider the combined environmental impacts of the two shopping centers. Finally, we explain that failure to correlate the acknowledged adverse air quality impacts to resulting adverse effects on human respiratory health was erroneous. These defects are prejudicial and compel decertification of the EIR's and rescission of project approvals and associated land use entitlements. In the unpublished portion of this decision, we resolve the rest of the CEQA challenges.

## FACTUAL OVERVIEW

Real party in interest Panama 99 Properties LLC (P99) is developing a 370,000-square-foot retail shopping center named Panama 99 (Panama) on 35 acres of vacant land located at the northeast corner of Panama Lane and Highway 99. The project site was zoned for mobilehome use and its general plan designation was low-density residential/open space.

Real party in interest and appellant Castle and Cooke Commercial-CA, Inc. (C & C), is developing a 700,000-square-foot regional retail shopping center

---

[1] References to mileage, square footage and acreage are approximate.

named Gosford Village (Gosford) on 73 acres of vacant land located on the southwest corner of Pacheco Road and Gosford Road. The project site's zoning and general plan land use designation was service industrial.

Panama is located 3.6 miles east of Gosford. The two shopping centers share some arterial roadway links.

Each shopping center will feature a 220,000-square-foot Supercenter as its primary anchor tenant. Supercenters "combin[e] the traditional Wal-Mart discount store with a full-size grocery store." Supercenters compete with large discount stores, traditional department stores, supermarkets and other grocery stores, as well as drug stores and apparel stores. The Supercenter at Panama will replace an existing Wal-Mart store that currently is located 1.4 miles north of the Panama site. In addition to the Supercenter, Panama will contain a Lowe's Home Improvement Warehouse (Lowe's), a gas station and a satellite pad. Gosford will contain a total of 17 retail stores, plus fast food restaurants and a gas station. In addition to the Supercenter, there will be six other anchor tenants, including Kohl's Department Stores (Kohl's) (apparel and home-related items) and Sam's Club (warehouse club selling groceries and a wide array of consumer products).

P99 and C & C (collectively, developers) applied in early 2002 for project approvals and associated zoning changes and general plan amendments. A separate EIR was prepared for each shopping center (hereafter the Panama EIR and the Gosford EIR). The Panama EIR concluded that Panama would have significant and unavoidable direct adverse impacts on air quality and noise. The Gosford EIR concluded that Gosford would have a significant and unavoidable adverse impact on air quality, both individually and cumulatively.

The Panama EIR identified the Supercenter and Lowe's as the two anchor tenants. The Gosford EIR did not identify any tenants. In response to comments questioning the environmental effects resulting from locating two Supercenters in a 3.6-mile radius, the Gosford EIR states that no tenants have been identified. However, it is clear from the administrative record that prior to certification of the Gosford EIR, the public and the City knew that one of Gosford's tenants was going to be a Supercenter.

The planning commission and the City Council considered the two projects at the same meetings. On February 12, 2003, the City Council certified the EIR's and adopted statements of overriding considerations on the nonpublic consent calendar. Then, after public hearing, it approved both projects and granted associated zoning changes and general plan amendments.

In March 2003, BCLC filed two CEQA actions challenging the sufficiency of the EIR's and contesting the project approvals and related land use entitlements (the Panama action and the Gosford action).

Soon thereafter, construction-related activities commenced on the project sites. In July 2003, the trial court denied BCLC's request for a temporary restraining order enjoining construction-related activities at the Gosford site.

Trial was held on the Panama action in November 2003 and on the Gosford action in January 2004. In both actions, the court concluded that CEQA required study of the question whether the two shopping centers, individually or cumulatively, could indirectly trigger a series of events that ultimately result in urban decay or deterioration.

BCLC unsuccessfully sought a temporary restraining order enjoining construction-related activities at the Panama site after the court orally announced its decision in the Panama action.

Argument was held concerning the proper remedy. The trial court concluded that the failure to study urban decay rendered the EIR's inadequate as informational documents and it ordered them decertified. It left the project approvals and associated land use entitlements intact and it severed the Supercenters from the remainder of the projects. It enjoined further construction of the partially built Supercenter buildings but allowed all other construction activities to continue pending full CEQA compliance. In its written judgments, the court found the EIR's deficient because they did not consider the direct and cumulative potential of "the Panama 99 project and the related Gosford Park project" to indirectly cause urban decay. However, the additional environmental review it ordered focused exclusively on the Supercenters, ordering study of the following two points: (1) cumulative impacts "on general merchandise businesses" arising from operating both Supercenters; (2) urban decay that could result from closure of the existing Wal-Mart on White Lane.

BCLC partially appealed both judgments; C & C partially cross-appealed the judgment in the Gosford action. The appeals were consolidated on our own motion.

Previously, we have denied petitions for writ of supersedeas that BCLC filed in March and June of 2004. Therein, BCLC sought an injunction prohibiting construction-related activities on the project sites pending resolution of the appeals.[2]

---

[2] BCLC made a disastrous tactical choice when it did not diligently and expeditiously seek a preliminary injunction in the trial court and extraordinary relief in this court at the first hint of construction activities. By the time BCLC petitioned us, the Kohl's store at Gosford was

During the pendency of these actions, the Lowe's store was constructed and it is operating at Panama. The Kohl's store was constructed and it is operating at Gosford. Sam's Business Trust acquired a 12-acre parcel at Gosford and we were notified in June 2004 that this entity would seek issuance of a building permit to construct the Sam's Club. A group known as Gosford at Pacheco LLC has purchased 25 acres of the Gosford site. Both Supercenters are partially constructed.

## DISCUSSION

At the outset, it is necessary to explicitly reject certain philosophical and sociological beliefs that some of the parties have vigorously expressed. For the record, we do not endorse BCLC's elitist premise that so-called big box retailers are undesirable in a community and are inherently inferior to smaller merchants, nor do we affirm its view that Wal-Mart, Inc. (Wal-Mart) is a destructive force that threatens the viability of local communities. Wal-Mart is not a named party in these actions and we rebuff BCLC's transparent attempt to demonize this corporation. We do not know whether Wal-Mart's entry into a geographic region or expansion of operations within a region is desirable for local communities. Similarly, we do not know whether Wal-Mart is a "good" or a "bad" employer. We offer no comment on Wal-Mart's alleged miserly compensation and benefit package because BCLC did not link the asserted low wages and absence of affordable health insurance coverage to direct or indirect adverse environmental consequences.

Likewise, we will not dignify with extended comment C & C's complaint that BCLC is just a "front" for a grocery worker's union whose disgruntled members feel threatened by nonunionized Wal-Mart's entry into the grocery business. As will be explained, BCLC has standing to pursue this litigation and it exhausted its administrative remedies. This is sufficient. We do not know whether Wal-Mart adversely affects the strength of organized labor and we have not considered this question.

In sum, we have no underlying ideological agenda and have strictly adhered to the accepted principle that the judicial system has a narrow role in land use battles that are fought through CEQA actions. "The only role for this court in reviewing an EIR is to ensure that the public and responsible officials are adequately informed ' "of the environmental consequences of their decisions *before* they are made." ' " (*Berkeley Keep Jets Over The Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1356 [111 Cal.Rptr.2d 598] (*Berkeley*).)

operating and the Lowe's store at Panama was almost complete. At that point, the equities did not weigh in BCLC's favor.

## I. *Standard of Review*

■ CEQA is codified at Public Resources Code section 21000 et seq. CEQA is augmented by the state CEQA Guidelines, codified at title 14 of the California Code of Regulations section 15000 et seq.[3] The Guidelines must be interpreted "in such a way as to 'afford the fullest possible protection of the environment.' " (*Friends of the Eel River v. Sonoma County Water Agency* (2003) 108 Cal.App.4th 859, 868 [134 Cal.Rptr.2d 322] (*Eel River*).) No party has challenged the legality of any of the applicable Guidelines and none of them appear to be " 'clearly unauthorized or erroneous under CEQA.' " (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123, fn. 4 [26 Cal.Rptr.2d 231, 864 P.2d 502] (*Laurel Heights II*).) Therefore, we will afford them " 'great weight.' " (*Ibid.*)

■ The applicable standard of review is well established. If the substantive and procedural requirements of CEQA are satisfied, a project may be approved even if it would create significant and unmitigable impacts on the environment. (*Fairview Neighbors v. County of Ventura* (1999) 70 Cal.App.4th 238, 242 [82 Cal.Rptr.2d 436].) ■ "In reviewing an agency's determination under CEQA, a court must determine whether the agency prejudicially abused its discretion. (§ 21168.5.) Abuse of discretion is established if the agency has not proceeded in a manner required by law or if the determination is not supported by substantial evidence." (*Dry Creek Citizens Coalition v. County of Tulare* (1999) 70 Cal.App.4th 20, 25–26 [82 Cal.Rptr.2d 398] (*Dry Creek*).) Courts are "not to determine whether the EIR's ultimate conclusions are correct but only whether they are supported by substantial evidence in the record and whether the EIR is sufficient as an information document." (*Association of Irritated Residents v. County of Madera* (2003) 107 Cal.App.4th 1383, 1391 [133 Cal.Rptr.2d 718] (*Irritated Residents*).) " 'The appellate court reviews the administrative record independently; the trial court's conclusions are not binding on it.' " (*Id.* at p. 1390.)

■ " 'The EIR must contain facts and analysis, not just the bare conclusions of the agency.' [Citation.] 'An EIR must include detail sufficient to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1390.) "CEQA requires an EIR to reflect a good faith effort at full disclosure; it does not mandate perfection, nor does it require an analysis to be exhaustive." (*Dry Creek, supra,* 70 Cal.App.4th at p. 26.) Therefore, "[n]oncompliance with CEQA's information disclosure requirements is not per se reversible; prejudice must be shown."

---

[3] Unless otherwise specified, statutory references are to the Public Resources Code. The state CEQA Guidelines will be cited as Guidelines.

(*Irritated Residents, supra,* 107 Cal.App.4th at p. 1391; § 21005, subd. (b).) Failure to comply with the information disclosure requirements constitutes a prejudicial abuse of discretion when the omission of relevant information has precluded informed decisionmaking and informed public participation, regardless whether a different outcome would have resulted if the public agency had complied with the disclosure requirements. (*Dry Creek, supra,* 70 Cal.App.4th at p. 26; *Irritated Residents, supra,* 107 Cal.App.4th at p. 1391.)

██ The substantial evidence standard is applied to conclusions, findings and determinations. It also applies to challenges to the scope of an EIR's analysis of a topic, the methodology used for studying an impact and the reliability or accuracy of the data upon which the EIR relied because these types of challenges involve factual questions. (*Federation of Hillside & Canyon Associations v. City of Los Angeles* (2000) 83 Cal.App.4th 1252, 1259 [100 Cal.Rptr.2d 301] (*Hillside*).) "Substantial evidence is defined as 'enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached.' " (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1391; Guidelines, § 15384, subd. (a).) Substantial evidence is not "[a]rgument, speculation, unsubstantiated opinion or narrative, evidence which is clearly inaccurate or erroneous, or evidence of social or economic impacts which do not contribute to, or are not caused by, physical impacts on the environment, is not substantial evidence. Substantial evidence shall include facts, reasonable assumptions predicated upon facts, and expert opinion supported by facts." (§ 21082.2, subd. (c); Guidelines, § 15384.)

## II. *Procedural Issues*

### A. *Standing*

██ C & C asserts that BCLC lacks standing because it is an economic competitor and not a bona fide environmental group. We reject this accusation as unproved speculation. The record supports the trial court's determination that BCLC has standing to pursue this litigation. "CEQA litigants often may be characterized as having competing economic interests." (*Burrtec Waste Industries, Inc. v. City of Colton* (2002) 97 Cal.App.4th 1133, 1138 [119 Cal.Rptr.2d 410].) One of BCLC's members is a homeowner residing near Gosford and he spoke in opposition to the projects at a public hearing prior to their approval. This is sufficient to satisfy CEQA's liberal standing requirement. (*Id.* at pp. 1138–1139; *Bozung v. Local Agency Formation Com.* (1975) 13 Cal.3d 263, 272 [118 Cal.Rptr. 249, 529 P.2d 1017] (*Bozung*).) In any event, unions have standing to litigate environmental claims. (See, e.g., *International Longshoremen's & Warehousemen's Union v. Board of Supervisors* (1981) 116 Cal.App.3d 265 [171 Cal.Rptr. 875].) Since C & C

did not support with legal argument or authority its perfunctory assertion that the trial court erred by quashing a deposition meant to elicit facts about BCLC's standing, we deem this point to be without foundation and reject it on this basis. (*In re Steiner* (1955) 134 Cal.App.2d 391, 399 [285 P.2d 972].)

B. *Exhaustion*

Next, we reject C & C's complaint about the timing of BCLC's objections to the shopping centers. C & C decries BCLC's failure to submit written comments on the draft EIR's and points out that BCLC's attorney presented his client's oral and documentary objections to the projects at the public hearing concerning project approvals that was held by the City Council on February 12, 2003. C & C does not specifically contend with proper legal argument and citation to applicable authority that BCLC failed to exhaust its administrative remedies but this appears to be the implication of its argument. Although we could dismiss as undeveloped whatever legal point C & C might have intended, we have elected to substantively resolve the exhaustion question because the issue is likely to reoccur.

 Exhaustion of administrative remedies is a jurisdictional prerequisite to maintenance of a CEQA action. Only a proper party may petition for a writ of mandate to challenge the sufficiency of an EIR or the validity of an act or omission under CEQA. The petitioner is required to have "objected to the approval of the project orally or in writing during the public comment period provided by this division or prior to the close of the public hearing on the project before the issuance of the notice of determination." (§ 21177, subd. (b).) The petitioner may allege as a ground of noncompliance any objection that was presented by any person or entity during the administrative proceedings. (*Resource Defense Fund v. Local Agency Formation Com.* (1987) 191 Cal.App.3d 886, 894 [236 Cal.Rptr. 794].) Failure to participate in the public comment period for a draft EIR does not cause the petitioner to waive any claims relating to the sufficiency of the environmental documentation. (*Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1120–1121 [71 Cal.Rptr.2d 1] (*Galante*).) However, the lead agency is not required to incorporate in the final EIR specific written responses to comments received after close of the public review period. (*City of Poway v. City of San Diego* (1984) 155 Cal.App.3d 1037, 1043–1044 [202 Cal.Rptr. 366].)

 When discussing exhaustion some opinions have identified certification of the EIR rather than approval of the project as the crucial cutoff point. (See, e.g., *Galante, supra,* 60 Cal.App.4th at p. 1121.) However, section 21177 specifically refers to close of the public hearing on project approval prior to issuance of the notice of determination, not certification of the EIR.

(§ 21177, subds. (a) & (b).) The correct formulation is expressed in *Hillside, supra,* 83 Cal.App.4th at page 1263: "[A] party can litigate issues that were timely raised by others, but only if that party objected to the project approval on any ground during the public comment period or prior to the close of the public hearing on the project."

We believe that the apparent inaccuracy in some case law results from the fact that environmental review is not supposed to be segregated from project approval. "[P]ublic participation is an 'essential part of the CEQA process.' " (*Laurel Heights II, supra,* 6 Cal.4th at p. 1123.) Although public hearings are encouraged, they are not explicitly required by CEQA at any stage of the environmental review process. (Guidelines, § 15087, subd. (i).) "Public comments may be restricted to written communications." (Guidelines, § 15202, subd. (a).) Yet, "[p]ublic hearings on draft EIRs are sometimes required by agency statute, regulation, rule, ordinance, or the agency's written procedures for implementation of CEQA." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2004) § 9.26, p. 408 (CEQA Practice).) "If an agency provides a public hearing on its decision to carry out or approve a project, the agency should include environmental review as one of the subjects for the hearing." (Guidelines, § 15202, subd. (b).) Since project approval and certification of the EIR generally occur during the same hearing, the two events are sometimes treated as interchangeable. (See, e.g., *Hillside, supra,* 83 Cal.App.4th at p. 1257 [final EIR certified at same hearing during which project was approved]; *Irritated Residents, supra,* 107 Cal.App.4th at p. 1389 [same].)

C & C disparagingly refers to BCLC's oral presentation and its submission of evidence at the February 12, 2003 City Council hearing as a last minute "document dump" and an intentional delaying tactic, pointing out that EIR's had been certified prior to opening of the public hearing. We reject this complaint because C & C omitted the key fact that the City had improperly segregated environmental review from project approval in contravention of Guidelines section 15202, subdivision (b). The planning commission bifurcated the process by agendizing certification of the EIR's as nonpublic hearing items and separately agendizing project approval and related land use entitlements as public hearing items. Similarly, the City Council agendized certification of the EIR's on the closed consent calendar and agendized the "concurrent general plan amendment/zone change[s]" necessary to implement the projects on the public hearing calendar. Since certification of the EIR's had been placed on the nonpublic consent calendar that was handled prior to the opening of the public hearing, counsel for BCLC necessarily voiced all of BCLC's objections, including defects in CEQA compliance, during the hearing on project approvals. He specifically objected to the bifurcated process and asked for certification of the EIR's to be removed from the

consent calendar and heard concurrently with the hearing on the project approvals and land use entitlements. The City Attorney recommended against this, incorrectly stating that this "would open up the entire EIR process, open up the new comment period, and delay the entire project because it would not be able to certify the EIR tonight."

City appears to have thought that the public's role in the environmental review process ends when the public comment period expires. Apparently, it did not realize that if a public hearing is conducted on project approval, then new environmental objections could be made until close of this hearing. (§ 21177, subd. (b); Guidelines, § 15202, subd. (b); *Hillside, supra,* 83 Cal.App.4th at p. 1263.) If the decisionmaking body elects to certify the EIR without considering comments made at this public hearing, it does so at its own risk. If a CEQA action is subsequently brought, the EIR may be found to be deficient on grounds that were raised at any point prior to close of the hearing on project approval.

C & C seems to assume that it was somehow entitled to final project approval in February 2003. On the contrary, the City Council was not obligated to certify the EIR's that evening. "[E]xpediency should play no part in an agency's efforts to comply with CEQA." (*San Franciscans for Reasonable Growth v. City and County of San Francisco* (1984) 151 Cal.App.3d 61, 74 [198 Cal.Rptr. 634] (*Reasonable Growth*).) As was cogently noted by the trial court, "the public agency decides when they are going to certify the EIR . . . . [¶] . . . [¶] . . . They didn't have to do it that night." C & C's complaint that allowing project opponents to raise objections after close of the public comment period for the draft EIR allows them to "sandbag" project proponents and delay certification "ad infinitum" should be presented to the Legislature, for it is a complaint about the design of the CEQA process.

We reject C & C's related contention that BCLC failed to participate in the public review process prior to certification of the EIR's because it is factually incorrect. BCLC actively participated in the administrative review process prior to certification of the EIR's. The City Planning Commission accepted public comment concerning the adequacy of the draft EIR's at a hearing on October 3, 2002. Sheila Stubblefield, who is described in the minutes of this meeting as BCLC's president and founder, spoke in opposition to both projects at that meeting. After the City Planning Commission voted in December 2002 to recommend certification of the EIR's and approval of the projects, BCLC notified the City in writing that it was appealing the planning commission's decision. The issues specifically raised by BCLC in this letter include urban decay and cumulative impacts. If an EIR is certified by an unelected planning commission, then the lead agency must

allow the public an opportunity to appeal the certification to an elected body. (§ 21151, subd. (c); Guidelines, § 15090, subd. (b); *Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 525–526 [100 Cal.Rptr.2d 889].) BCLC sent a second letter to City before the February 2003 City Council meeting. It outlined several inadequacies in the EIR's and raised other objections to approvals of the project. Then, BCLC's legal counsel appeared at the City Council meeting and proffered oral and documentary support for BCLC's previously expressed position that the EIR's were legally inadequate. Since the certification of the EIR's had been placed on the nonpublic consent calendar, he necessarily spoke during the hearing on project approvals.

Finally, we dismiss C & C's assertion that BCLC only challenged the Supercenter aspect of the shopping centers. The evidence contradicts this position and demonstrates that BCLC's objections concerning urban decay and cumulative impacts related to the shopping centers as a whole. For example, BCLC's December 2002 letter appealing the decision of the planning commission specifically referenced the addition of over one million square feet of retail space. Nowhere within this letter did BCLC mention Wal-Mart or the Supercenters. BCLC's February 2003 letter also references urban decay as a consequence of the shopping centers and it cites relevant authorities. The trial court's oral decisions and written judgments found the EIR's deficient because they failed to consider whether the shopping centers could indirectly cause urban decay. It was only the remedy that inexplicably was limited to the Supercenters.

In essence, C & C has imputed bad faith on BCLC's part without offering any evidence to justify the accusation. BCLC actively and properly participated in the administrative review process. It did not contravene CEQA by challenging the adequacy of the EIR's at the February 2003 City Council meeting and submitting evidence supporting their position. There is no indication in the record that if the City had seriously considered the objections asserted by BCLC and others and if it had revised the EIR's in response to these objections, BCLC subsequently would have asserted new inadequacies solely to delay the projects. It is the City's bifurcated process, which resulted in segregation of environmental review from project approval, that supports an imputation of bad faith, an inference BCLC civilly does not press.

### C. *Mootness*

Developers achieved an important practical victory when they convinced the trial court to leave the project approvals in place, sever the Supercenters from the remainder of the projects and allow construction of the rest of the

shopping centers to proceed prior to full CEQA compliance. As a result, retail businesses currently are operating at both project sites and nonparties have acquired portions of the project sites. This has generated substantial economic and psychological pressures in favor of the shopping centers as presently approved and partially constructed. BCLC cannot provide any precedent for closure of an operating retail establishment because the retailer's landlord failed to adequately comply with CEQA and it has not asked us to order these businesses to cease operations pending full CEQA compliance. Given this state of affairs, questions necessarily arise concerning redressability and consequent mootness. Has the danger of irreversible momentum in favor of the shopping centers, about which we warned in *San Joaquin Raptor/Wildlife Rescue Center v. County of Stanislaus* (1994) 27 Cal.App.4th 713 at page 742 [32 Cal.Rptr.2d 704] (*Raptor*), been realized?

Undoubtedly some would view further environmental study of the partially completed projects as a futile waste of time and money. Since CEQA's purpose is not to generate meaningless paperwork (*Bozung, supra,* 13 Cal.3d at p. 283), we were tempted to find the alleged defects in CEQA compliance essentially nonredressable and therefore moot. Yet, after reviewing briefing on this question, we decided not to adopt this rather cynical position. For the following reasons, we have concluded that the CEQA issues remain viable and therefore, we decline to dismiss the appeals as moot.

First, developers expressly recognized that they were proceeding at their own risk when they relied on the contested project approvals during the pendency of this litigation. When an injunction is not granted after commencement of a CEQA action, the agency is to assume that the contested EIR or negative declaration satisfies CEQA's requirements. However, "[a]n approval granted by a responsible agency in this situation provides only permission to proceed with the project at the applicant's risk prior to a final decision in the lawsuit." (Guidelines, § 15233, subd. (b).) Although BCLC's failure to diligently and expeditiously seek injunctive relief necessitated our denial of its belated pleas for issuance of extraordinary relief pending issuance of this opinion, it did not provide developers with a "pass" on full CEQA compliance or grant them any vested interest in improvements that were completed at their own risk. The sale or lease of land to third parties was beyond BCLC's control. Such third party transactions do not immunize defective land use approvals. As a matter of public policy and basic equity, developers should not be permitted to effectively defeat a CEQA suit merely by building out a portion of a disputed project during litigation or transferring interests in the underlying real property. Failure to obtain an injunction should not operate as a de facto waiver of the right to pursue a CEQA action.

Second, questions concerning urban decay and cumulative impacts constitute important issues of broad public interest that are likely to reoccur.

(*Lundquist v. Reusser* (1994) 7 Cal.4th 1193, 1202, fn. 8 [31 Cal.Rptr.2d 776, 875 P.2d 1279]; *Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 [98 Cal.Rptr.2d 202].)

Finally, even at this late juncture full CEQA compliance would not be a meaningless exercise of form over substance. The City possesses discretion to reject either or both of the shopping centers after further environmental study and weighing of the projects' benefits versus their environmental, economic and social costs. As conditions of reapproval, the City may compel additional mitigation measures or require the projects to be modified, reconfigured or reduced. The City can require completed portions of the projects to be modified or removed and it can compel restoration of the project sites to their original condition. (*Association for a Cleaner Environment v. Yosemite Community College Dist.* (2004) 116 Cal.App.4th 629, 641 [10 Cal.Rptr.3d 560]; *Woodward Park Homeowners Assn. v. Garreks, Inc.* (2000) 77 Cal.App.4th 880, 888–890 [92 Cal.Rptr.2d 268].) We presume that the City will fully and sincerely assess the new information contained in the revised EIR's and that it will fairly and independently decide whether reapproval of the projects is in the best interests of the City's residents, giving no weight to the fact that the shopping centers are partially constructed.

### III. *Urban Decay*

Water contamination and air pollution, now recognized as very real environmental problems, initially were scoffed at as the alarmist ravings of environmental doomsayers. Similarly, experts are now warning about land use decisions that cause a chain reaction of store closures and long-term vacancies, ultimately destroying existing neighborhoods and leaving decaying shells in their wake. In this case, the trial court recognized that the shopping centers posed a risk of triggering urban decay or deterioration[4] and it concluded that CEQA required analysis of this potential impact. C & C has challenged this determination. We find C & C's arguments unpersuasive and agree that CEQA requires analysis of the shopping centers' individual and cumulative potential to indirectly cause urban decay.

Guidelines section 15126.2 requires an EIR to identify and focus on the significant environmental impacts of the proposed project. In relevant part, this section provides: "Direct and indirect significant effects of the project on the environment shall be clearly identified and described, giving due consideration to both the short-term and long-term effects." (Guidelines, § 15126.2, subd. (a).) Guidelines section 15064, subdivision (d)

---

[4] Some of the parties use the term "urban blight," assuming that it is interchangeable with "urban decay." This is incorrect. "Blight" is a term with specialized meaning that has not been shown to be applicable. (See Health & Saf. Code, § 33030 et seq.)

mandates that both primary (direct) and "reasonably foreseeable" secondary (indirect) consequences be considered in determining the significance of a project's environmental effect.

"CEQA is not a fair competition statutory scheme." (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1235 [94 Cal.Rptr.2d 740].) Therefore, the economic and social effects of proposed projects are outside CEQA's purview. (Guidelines, § 15131, subd. (a).) Yet, if the forecasted economic or social effects of a proposed project directly or indirectly will lead to adverse physical changes in the environment, then CEQA requires disclosure and analysis of these resulting physical impacts. (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019 [100 Cal.Rptr.2d 413] (*Friends of Davis*); *Citizens for Quality Growth v. City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 445–446 [243 Cal.Rptr. 727] (*Mt. Shasta*).) Subdivision (e) of Guidelines section 15064 provides that when the economic or social effects of a project cause a physical change, this change is to be regarded as a significant effect in the same manner as any other physical change resulting from the project. (See, e.g., *El Dorado Union High School Dist. v. City of Placerville* (1983) 144 Cal.App.3d 123, 131 [192 Cal.Rptr. 480] [potential of increased student enrollment in an already overcrowded school resulting from construction of the proposed apartment complex was an environmental effect that required treatment in an EIR because it could lead to the necessity of constructing at least one new high school].) Conversely, where economic and social effects result from a physical change that was itself caused by a proposed project, then these economic and social effects may be used to determine that the physical change constitutes a significant effect on the environment. (See, e.g., *Christward Ministry v. Superior Court* (1986) 184 Cal.App.3d 180, 197 [228 Cal.Rptr. 868] [when a waste management facility was proposed next to a religious retreat center, CEQA required study whether the physical impacts associated with the new facility would disturb worship in the natural environment of the retreat center].) Guidelines section 15131, subdivision (a) provides, "An EIR may trace a chain of cause and effect from a proposed decision on a project through anticipated economic or social changes resulting from the project to physical changes in turn caused by the economic or social changes. The intermediate economic or social changes need not be analyzed in any detail greater than necessary to trace the chain of cause and effect. The focus of the analysis shall be on the physical changes."

Case law already has established that in appropriate circumstances CEQA requires urban decay or deterioration to be considered as an indirect environmental effect of a proposed project. The relevant line of authority begins with *Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151 [217 Cal.Rptr. 893] (*Bishop*). There, the appellate court held that adoption of multiple negative declarations for

different aspects of the same large regional shopping center violated CEQA. (*Id.* at p. 167.) The court also agreed with appellant that on remand "the lead agency must consider whether the proposed shopping center will take business away from the downtown shopping area and thereby cause business closures and eventual physical deterioration of downtown Bishop." (*Id.* at p. 169.) Citing Guidelines section 15064, the court found that the lead agency had an affirmative duty to consider whether the new shopping center would start an economic chain reaction that would lead to physical deterioration of the downtown area. (172 Cal.App.3d at p. 170.) Therefore, "[o]n remand the lead agency should consider physical deterioration of the downtown area to the extent that potential is demonstrated to be an indirect environmental effect of the proposed shopping center." (*Id.* at p. 171.)

Next, *Mt. Shasta, supra,* 198 Cal.App.3d 433, invalidated an EIR for a proposed shopping center for numerous reasons. In relevant part, the court determined that the EIR was defective because it failed to "consider the potential physical effect of the rezoning on the central business area. The EIR pointed out the proposed project may pose a significant economic problem for existing businesses, but offered little analysis of the issue . . . ." (*Id.* at p. 445.) The court rejected respondent's justification that "no analysis of economic effects was required in the EIR." (*Id.* at p. 446.) Citing *Bishop, supra,* 172 Cal.App.3d 151 and Guidelines section 15064, it explained that "[t]he potential economic problems caused by the proposed project could conceivably result in business closures and physical deterioration of the downtown area. Therefore, on remand, City should consider these problems to the extent that potential is demonstrated to be an indirect environmental effect of the proposed project." (*Mt. Shasta, supra,* 198 Cal.App.3d at p. 446.)

*City of Pasadena v. State of California* (1993) 14 Cal.App.4th 810 [17 Cal.Rptr.2d 766] addressed this issue as part of its determination whether a project to relocate a parole office was exempt from CEQA. In assessing whether the significant effect exception applied, the court discussed *Bishop, supra,* 172 Cal.App.3d 151. It agreed that social and economic effects must be considered if they will cause physical changes but found *Bishop* distinguishable because appellant in this case had not made a "showing or argument that [relocation of the parole office] would cause the physical deterioration of the area." (*City of Pasadena, supra,* 14 Cal.App.4th at p. 828.)

*Friends of Davis, supra,* 83 Cal.App.4th 1004 (distinguished, *post*) rejected the position that identification of a Borders bookstore as a prospective tenant in a retail development compelled supplemental environmental review. There, the City of Davis (Davis) certified an EIR for a specific plan that reflected designation of the subject property for retail use. The applicant subsequently

acquired an option to purchase the property and applied for design review of a proposed retail development that conformed to the specific plan and current zoning designation. During the design review process, it was revealed that one of the tenants would be a Borders bookstore. Davis planning staff took the position that the design review process did not differentiate between one type of retail tenant and another. Over objection from citizens who sought to use the design review ordinance to exclude Borders from locating in Davis, the planning commission's decision to approve the design review application was upheld. The appellate court agreed with Davis, carefully explaining that it was "not reviewing the record to determine whether it demonstrates a possibility of environmental impact, but are viewing it in a light most favorable to the City's decision in order to determine whether substantial evidence supports the decision not to require additional review." (*Id.* at p. 1021.) Prior environmental review already encompassed retail use of the property. A subsequent EIR was not required merely because it "appears likely" that Borders would compete with existing bookstores. (*Ibid.*) Appellant had not presented any evidence supporting its assumptions "that existing downtown bookstores will not be able to compete with Borders and will close[,] . . . that the bookstores will not be replaced by new or different businesses . . . [and] that the bookstore closures will cause other downtown businesses to close, thus leading to a general deterioration of the downtown area." (*Ibid.*)

Most recently, it was held that the project description for a proposed warehouse distribution center did not have to specifically identify the end user because this information did not implicate new or different environmental effects other than those that had been addressed in the EIR. (*Maintain Our Desert Environment v. Town of Apple Valley* (2004) 120 Cal.App.4th 396 [15 Cal.Rptr.3d 322] (*Apple Valley*).)

It is apparent from the case law discussed above that proposed new shopping centers do not trigger a conclusive presumption of urban decay. However, when there is evidence suggesting that the economic and social effects caused by the proposed shopping center ultimately could result in urban decay or deterioration, then the lead agency is obligated to assess this indirect impact. Many factors are relevant, including the size of the project, the type of retailers and their market areas and the proximity of other retail shopping opportunities. The lead agency cannot divest itself of its analytical and informational obligations by summarily dismissing the possibility of urban decay or deterioration as a "social or economic effect" of the project.

C & C contends that study is not required because the record does not contain substantial evidence proving that the shopping centers will cause urban decay. This argument founders because it is premised on the wrong

standard of review. Substantial evidence is the standard applied to conclusions reached in an EIR and findings that are based on such conclusions. (*Irritated Residents, supra,* 107 Cal.App.4th at pp. 1390–1391.) BCLC is not challenging a conclusion in the EIR's that the shopping centers would not indirectly cause urban decay or a finding adopted by the City. It is not arguing that the City used the wrong methodology in assessing whether urban decay will be an indirect effect of the project or challenging the validity of an expert's opinion on this topic. Rather, BCLC's argument is that the EIR's failed to comply with the information disclosure provisions of CEQA because they omitted any meaningful consideration of the question whether the shopping centers could, individually or cumulatively, trigger a series of events that ultimately cause urban decay. Neither EIR even contains a statement indicating reasons why it had been determined that urban decay was not a significant effect of the proposed projects. (§ 21100, subd. (c).) BCLC is challenging the City's view that such an analysis was purely economic and therefore was outside the scope of CEQA. The substantial evidence standard of review is not applied to this type of CEQA challenge. The relevant question is whether the lead agency failed to proceed as required by law. (1 Kostka & Zischke, CEQA Practice, *supra,* § 12.5, pp. 464–466.1.) "[A]lthough the agency's factual determinations are subject to deferential review, questions of interpretation or application of the requirements of CEQA are matters of law. [Citations.] While we may not substitute our judgment for that of the decision makers, we must ensure strict compliance with the procedures and mandates of the statute." (*Save Our Peninsula Committee v. Monterey County Bd. of Supervisors* (2001) 87 Cal.App.4th 99, 118 [104 Cal.Rptr.2d 326] (*Peninsula*).) If C & C is contending that claims concerning omission of information from an EIR essentially should be treated as inquiries whether there is substantial evidence supporting the decision approving the projects, we reiterate our rejection of this position for the reasons previously expressed in *Irritated Residents, supra,* 107 Cal.App.4th at page 1392.

In any event, C & C's position has no substantive merit. There is a great deal of evidence in the record supporting the validity of concerns that the shopping centers could cause a ripple of store closures and consequent long-term vacancies that would eventually result in general deterioration and decay within and outside the market area of the two shopping centers. Although much of BCLC's evidence specifically applied to the Supercenters, the administrative records as a whole contain sufficient indication that addition of 1.1 million square feet of retail space in the shopping centers' overlapping market areas could start the chain reaction that ultimately results in urban decay to necessitate study of the issue with respect to the entirety of the shopping centers.

First, BCLC retained a professor of economics at San Francisco State University, C. Daniel Vencill, to study the cumulative economic effects that will be caused by the two new Supercenters (the Vencill report). Together with two colleagues, Vencill reviewed literature and analyzed the five-mile area surrounding the project sites. Photographs were taken of the sites and "existing blight conditions which have remained unabated for some years in the area surrounding the proposed new sites" were documented. The Vencill report determined that the two shopping centers are in the same shopper catchment area and they will be competing with each other as well as with existing retail establishments. It states that "[t]here are [four] existing shopping centers and malls that will be adversely affected by [Gosford and Panama]. One regional mall is suspected of being in serious decline." The two Supercenters represent significant excess capacity as configured and located. "This will result in oversaturation and fall-out of weaker competitors in the at-risk commercial blight zone the developments will create." The Vencill report identified 29 businesses, primarily but not exclusively grocery stores, that are at direct risk of closure. Two Albertsons are "facing extinction" and a small nursery that is located across the street from Gosford "would certainly become defunct." Additionally, no "alternative plans" were observed for the Wal-Mart building on White Lane that will be vacant when this Wal-Mart store is replaced by the Supercenter at Panama. The Vencill report finds: "It is reasonably probable [that] competition provided by the two proposed [Supercenters] (i.e., the diversion of existing sales from local merchants), individually and especially cumulatively, will have economic impacts on existing businesses triggering a chain of events that may lead to adverse effects on the physical environment in the southern part of Bakersfield. One of the ways this may occur is that smaller retailers in the area, particularly those located within five miles of the sites, and even more specifically those retailers already struggling or on the verge of having to terminate operations, will be unable to compete and will have to go out of business. In turn, this may cause permanent or long-term vacancies of retail space in the area. The result is typically neglect of maintenance and repair of retail facilities, the deterioration of buildings, improvements, and facilities. This may then culminate in physical effects associated with blight-like conditions, which include visual and aesthetic impacts accompanying the physical deterioration."

BCLC also submitted numerous studies and articles analyzing the adverse effects other communities in California (San Diego, Orange County and Calexico,) and elsewhere (Oklahoma City, Oklahoma; Bath, Maine; Eastern Pennsylvania; Chicago, Illinois; Syracuse, New York) have experienced as a

result of saturation of a market area with super-sized retailers.[5] As relevant here, the authors found numerous adverse effects resulting from saturation of a market area with Supercenters and similar retail facilities, such as SuperTargets and SuperKmarts. These effects include, but are not limited to, physical decay and deterioration resulting from store closures in the same market area or in established areas of the community (i.e., the "traditional downtown area") due to competitive pressures, followed by an inability to easily re-lease the vacated premises. The authors also found that it had been difficult to find tenants for buildings that formerly housed Wal-Mart stores that were replaced by the new Supercenters. Many of the empty buildings physically deteriorated.

This evidence cannot be cavalierly dismissed as "hit pieces" designed to disparage a specific corporation. Studies discussing the experiences of other communities constitute important anecdotal evidence about the way the proposed shopping centers could serve as a catalyst for urban deterioration and decay in the City. The Vencill report is extremely significant and it strongly supports BCLC's position that CEQA requires analysis of urban decay.[6]

Moreover, numerous individuals commented about urban decay during the administrative process. For example, at the planning commission's public hearing on the adequacy of the draft EIR's, Cindy Fabricius stated, "[T]here are 45 empty Wal-Marts in the state of Texas. There are 34 empty standing Wal-Marts in the state of Georgia. There are 27 in Utah. Find them. Go look at them. They are empty. When Wal-Mart moves on they leave their boxes. Those boxes are not bought up by other [businesses]; who can afford that huge of a store; that huge of a rent?" Herman Lee commented that there are parts of East Bakersfield that need revitalization. Yet, the proposed shopping centers are out in the southwest part of town. He queried, "What about the people on the east side of town?" Some comments made at the February 2003 City Council meeting are also relevant. A representative of Save Mart

---

[5] Rea & Parker Research report prepared for San Diego County Taxpayers Association entitled The Potential Economic and Fiscal Impact of Supercenters in San Diego, A Critical Analysis (2000) of report by Boarnet & Crane entitled The Impact of Big Box Grocers on Southern California Jobs, Wages and Municipal Finances; The Impact of Big Box Grocers on Southern California, Jobs, Wages, and Municipal Finances prepared for Orange County Business Council (1999); Rea & Parker Research, Smart Growth's Response to Big-Box Retailers: City of Villages—A Renewed Orientation Toward Communities and Neighborhoods (2001) prepared for the independent Grocers Association of Calexico; Shils & Taylor, Measuring the Economic and Sociological Impact of the Mega-Retail Discount Chains on Small Enterprise in Urban, Suburban and Rural Communities (1997); Welles, When Wal-Mart Comes to Town (July 1, 1993) Inc.

[6] City Council Member Maggard's comment at the February 2003 City Council meeting that BCLC's documentary support is merely fit "for recycling" demonstrates his lack of awareness of the relevant legal principles.

Supermarkets spoke in opposition to the project and submitted the data concerning Oklahoma City. He stated that the addition of the two shopping centers will adversely affect existing shopping centers and asserted that the "[t]he potential for urban blight and decay is a matter which must be considered" in the EIR's. Another commercial property owner wrote that he had been unable to re-lease a building that formerly housed a grocery store and he ended up demolishing the building. When a grocery store closes, the remainder of the stores in the shopping center are likely to close. The center "could end up with many boarded up storefronts." Another citizen wrote a letter that included six examples of buildings in the City that formerly housed large retail stores and now are "vacant, rundown box buildings and shopping centers." He was concerned that the proposed projects would result in more "empty warehouse type, rundown buildings" littering the City. While these individuals are not experts in any sense of the word, their firsthand observations should not casually be dismissed as immaterial because "relevant personal observations are evidence." (*Bishop, supra,* 172 Cal.App.3d at p. 173; see also *Ocean View Estates Homeowners Assn., Inc. v. Montecito Water Dist.* (2004) 116 Cal.App.4th 396, 402 [10 Cal.Rptr.3d 451].)

The responses in the EIR's to these and other comments do not meaningfully address the issue of urban decay. The Gosford EIR states that vacant buildings "are part of the evolutional change of the retail environment." It then asserts that further analysis is outside the scope of CEQA because economic and social effects are not considered environmental effects under CEQA. The response in the Panama EIR is similarly incomplete. Ignoring the question of urban decay or deterioration, it simply replies that "blight" is a legal term that does not apply. It also asserts that vacancy rates and business closures are purely economic impacts and therefore outside of CEQA. Finally, it states that a survey of vacant buildings had been prepared and this survey demonstrated that "retailers entering or leaving the market, relocations, re-leasing to new tenants or conversions to other uses is a normal part of a dynamic market."[7]

The Retail Impact Analysis (retail analysis) that was appended to the Panama EIR does not constitute an acceptable substitute for proper identification and analysis in an EIR. The retail analysis analyzed "the potential market support and retail sales impacts" of the Supercenter component of Panama. It found that general merchandise stores have a market area of approximately

---

[7] The parties did not mention this survey. Since the survey did not consider questions concerning the likely effects that the addition of 1.1 million square feet of new retail space would have on the vacancy rate in the City or address the likelihood of re-leasing vacant premises that formerly were occupied by competitors of the proposed shopping centers, we find it unhelpful.

five miles; grocery stores have a market area of approximately two miles.[8] It concluded that there is sufficient capacity to sustain the Supercenter at Panama without causing closure of existing general merchandise or grocery stores. However, the Supercenter would reduce the business volume of existing stores. The retail analysis stated that the existing Wal-Mart store building could be utilized in another unspecified capacity.

The retail analysis did not reference Gosford or consider whether there is sufficient capacity to sustain both shopping centers. It did not analyze whether the combined influx of both shopping centers would lead to the closure of existing grocery or general merchandise stores, particularly where their market areas overlap. Rather, it focused on the single narrow question whether there is sufficient demand to sustain the Supercenter at Panama. It did not meaningfully consider whether addition of 1.1 million square feet of new retail space, much of it housing Supercenters, Sam's Club and other large retailers such as Lowe's and Kohl's (which dominate individual merchandise areas and are sometimes referred to as "category killers") will displace older, smaller retail stores and shopping centers, leaving long-term vacancies that deteriorate and encourage graffiti and other unsightly conditions. Furthermore, the retail analysis fails to meaningfully address the question whether the building on White Lane that currently houses a Wal-Mart store will experience a long-term vacancy when this store is closed. No facts are offered in support of the retail analysis's conclusion that the building can be leased to another tenant. "Can" is not equivalent to "will" and the difference in the two words is crucial when assessing whether the store closure will result in an adverse environmental impact. The retail analysis characterizes vacancies as normal parts of a dynamic and evolving retail environment without considering whether those vacancies are clustered in one area or are likely to be long term.

We agree with BCLC that *Mt. Shasta, supra,* 198 Cal.App.3d 433, is analogous. Just as in *Mt. Shasta*, it is apparent that in this case the shopping centers could, individually and cumulatively, trigger the same downward spiral of business closures, vacancies and deterioration that other communities have experienced when they allowed similar saturation development. Therefore, CEQA requires analysis of this potential environmental impact.

C & C argues that the instant case is analogous to *Friends of Davis, supra,* 83 Cal.App.4th 1004. We disagree. *Friends of Davis* considered whether a

---

[8] After stating that general merchandise stores have a market area of five miles or more, the retail analysis inexplicably assigns without explanation three miles as the relevant market area with respect to the Supercenter at Panama. Since this conclusion is not supported by any explanation or analysis and it is directly contradicted by other information in the retail analysis, we decline to afford it any weight.

supplemental EIR was required. No zoning change or nonconformity with the existing specific plan existed and retail development on the project site had already been subjected to full environmental review. In contrast here, there has not been any previous study of the environmental effects associated with the requested zoning changes and general plan amendments. No prior EIR's considered the consequences of building shopping centers on the project sites. Rather, it is the sufficiency of the initial EIR's that is at issue.

It must be mentioned that although we do not quarrel with the holding in *Apple Valley, supra,* 120 Cal.App.4th 396, it is factually distinguishable from this situation. Here, recognition of the characteristics of the shopping centers' tenants is a necessary prerequisite to accurate identification and analysis of the environmental consequences that will result from approval of the proposed projects. When the particular type of retail business planned for a proposed project will have unique or additional adverse impacts, then disclosure of the type of business is necessary in order to accurately recognize and analyze the environmental effects that will result from the proposed project. A rendering plant has different environmental impacts than a chandler. In the retail context, Supercenters are similarly unique. Unlike the vast majority of stores, many Supercenters operate 24 hours per day seven days a week. Such extended operational hours raise questions concerning increased or additional adverse impacts relating to lights, noise, traffic and crime. While specific identification of the name of the tenant may be unnecessary, to simply state as did the Gosford EIR that "no stores have been identified" without disclosing the type of retailers envisioned for the proposed project is not only misleading and inaccurate, but it hints at mendacity.

Accordingly, we hold that the omission of analysis on the issue of urban/suburban decay and deterioration rendered the EIR's defective as informational documents. (*Mt. Shasta, supra,* 198 Cal.App.3d at p. 446.) On remand, the EIR's must analyze whether the shopping centers, individually and/or cumulatively, indirectly could trigger the downward spiral of retail closures and consequent long-term vacancies that ultimately result in decay. (*Ibid.; Bishop, supra,* 172 Cal.App.3d at p. 171.)

IV. *Cumulative Impacts*

The Gosford EIR and the Panama EIR considered each shopping center in isolation. The cumulative impacts sections of each EIR do not reference the other shopping center and neither EIR contains any discussion of or reference to retail development in the area surrounding the project site. BCLC argues that the "failure to treat Panama and Gosford as 'relevant projects' for purposes of evaluating cumulative effects" is "[a]n overarching legal flaw in both EIRs." We agree. The trial court correctly realized that the cumulative

effect of the two shopping centers must be analyzed with respect to the topic of urban decay. However, it inexplicably failed to follow the applicable chain of reasoning to its logical conclusion and recognize that the cumulative effects analyses were fundamentally flawed because they did not recognize that the shopping centers were relevant projects and did not analyze the type and severity of impacts that will result from construction and operation of both projects.

■ "A fundamental purpose of CEQA is to ensure that governmental agencies regulate their activities 'so that major consideration is given to preventing environmental damage, while providing a decent home and satisfying living environment for every Californian.' [Citations.] . . . The heart of CEQA is the EIR. [Citation.] Its purposes are manifold, but chief among them is that of providing public agencies and the general public with detailed information about the effects of a proposed project on the environment. [Citations.] [¶] Part of this vital informational function is performed by a cumulative impact analysis." (*Reasonable Growth, supra,* 151 Cal.App.3d at pp. 72–73.) "The term ' "[c]umulative impacts" refer[s] to two or more individual effects which, when considered together, are considerable or which compound or increase other environmental impacts.' " (*Raptor, supra,* 27 Cal.App.4th at p. 739.) "[A] cumulative impact consists of an impact which is created as a result of the combination of the project evaluated in the EIR together with other projects causing related impacts." (Guidelines, § 15130, subd. (a)(1).) " 'The cumulative impact from several projects is the change in the environment which results from the incremental impact of the project when added to other closely related past, present, and reasonabl[y] foreseeable probable future projects. Cumulative impacts can result from individually minor but collectively significant projects taking place over a period of time.' (CEQA Guidelines, § 15355, subd. (b).) 'Cumulative impact analysis "assesses cumulative damage as a whole greater than the sum of its parts." ' " (*Irritated Residents, supra,* 107 Cal.App.4th at p. 1403.)

"The significance of a comprehensive cumulative impacts evaluation is stressed in CEQA." (*Schoen v. Department of Forestry & Fire Prevention* (1997) 58 Cal.App.4th 556, 572 [68 Cal.Rptr.2d 343].) Proper cumulative impact analysis is vital "because the full environmental impact of a proposed project cannot be gauged in a vacuum. One of the most important environmental lessons that has been learned is that environmental damage often occurs incrementally from a variety of small sources. These sources appear insignificant when considered individually, but assume threatening dimensions when considered collectively with other sources with which they interact." (*Communities for a Better Environment v. California Resources Agency* (2002) 103 Cal.App.4th 98, 114 [126 Cal.Rptr.2d 441], fns. omitted; see also *Los Angeles Unified School Dist. v. City of Los Angeles* (1997) 58 Cal.App.4th 1019, 1025 [68 Cal.Rptr.2d 367].) "[C]onsideration of the effects

of a project or projects as if no others existed would encourage the piecemeal approval of several projects that, taken together, could overwhelm the natural environment and disastrously overburden the man-made infrastructure and vital community services. This would effectively defeat CEQA's mandate to review the actual effect of the projects upon the environment." (*Las Virgenes Homeowners Federation, Inc. v. County of Los Angeles* (1986) 177 Cal.App.3d 300, 306 [223 Cal.Rptr. 18].)

When faced with a challenge that the cumulative impacts analysis is unduly narrow, the court must determine whether it was reasonable and practical to include the omitted projects and whether their exclusion prevented the severity and significance of the cumulative impacts from being accurately reflected. (*Kings County Farm Bureau v. City of Hanford* (1990) 221 Cal.App.3d 692, 723 [270 Cal.Rptr. 650] (*Farm Bureau*).)

It is beyond dispute that the two shopping centers are both "present" projects within the meaning of Guidelines section 15355, subdivision (b). They were proposed within a month of each other and both shopping centers were considered at the same meetings of the City Planning Commission and the City Council. Many citizens, including BCLC, voiced their opinions about both shopping centers at the same time. Thus, the determinative question is whether Gosford and Panama also are "closely related" within the meaning of Guidelines section 15355, subdivision (b). We answer this question in the affirmative.

First, there is evidence showing that the two shopping centers will compete with each other. Some of the anchor tenants at both shopping centers are regional draws with a market area in excess of five miles. The Vencill report states that the market area for stores like Supercenters is about five miles. It concludes that the two shopping centers are in the same shopper catchment area and the Supercenters will compete with each other. Similarly, the retail analysis states that general merchandise stores have a market area of five miles or more. Grocery stores have a market area of two miles or more. Since Gosford and Panama are 3.6 miles apart, the two market areas necessarily overlap. As previously discussed, the record contains numerous studies analyzing the adverse effects other communities have experienced when a market area was saturated with large-scale retailers such as traditional Wal-Mart stores and their siblings, Supercenters and Sam's Clubs. Studies discussing the adverse effects that other communities experienced after similar retail development constitutes important anecdotal evidence about the adverse impacts that the City may experience.

Second, the Gosford EIR and the Panama EIR show that the two shopping centers share four arterial roadways: Pacheco Road, Panama Lane, Harris

Road and White Lane. A planning commissioner stated that he was concerned that the two projects could have combined, unrecognized adverse impacts on traffic.

Third, ambient air quality is a serious concern. Each of the EIR's concluded that the proposed shopping center would have an unavoidable adverse impact on ambient air quality. The San Joaquin Valley Air Pollution Control District (SJVAPCD) expressed the opinion that each project "and others similar to it will cumulatively reduce air quality in the San Joaquin Valley." This will "make it more difficult to meet mandated emission reductions and air quality standards."

When considered in its entirety, this evidence strongly supports BCLC's position that the two shopping centers are closely related and may have several cumulatively significant adverse impacts. Therefore, CEQA compels assessment and disclosure of these combined environmental effects.

 There is no merit to the position of City and developers that cumulative impacts analysis does not require consideration of both shopping centers because, in each case, the other shopping center is outside the radius of the "project area" as defined in EIR's. An EIR is required to discuss significant impacts that the proposed project will cause in the area that is affected by the project. (CEQA Guidelines, § 15126.2, subd. (a).) This area cannot be so narrowly defined that it necessarily eliminates a portion of the affected environmental setting. Furthermore, Guidelines section 15130, subdivision (b)(3) directs agencies to "define the geographic scope of the area affected by the cumulative effect and provide a reasonable explanation for the geographic limitation used." Neither the Gosford EIR nor the Panama EIR complied with this requirement. The EIR's state what has been determined to be the appropriate geographic area for each category of potential impacts, but no explanation was offered as to the criterion upon which this determination was made. Simply put, selection of "appropriate" geographic areas that just happen to narrowly miss the other large proposed shopping center in every category of impacts despite their overlapping market areas and shared roadways does not constitute the good faith disclosure and analysis that is required by CEQA. In *Raptor, supra*, 27 Cal.App.4th 713, we found the description of the environmental setting in an EIR prepared for a residential project to be deficient because it failed to mention nearby wetlands and a wildlife preserve. (*Id.* at pp. 722–729.) Omission of any reference in the EIR's to the other proposed shopping center is similarly "inaccurate and misleading." (*Id.* at p. 724.)

 We are unpersuaded by C & C's argument that the cumulative impacts of the two projects were accounted for because the Gosford EIR

based its discussion of certain environmental effects, such as air quality, on a summary of projections contained in an approved planning document. Use of a planning document does not preclude challenge to the accuracy or sufficiency of the cumulative impacts analysis. As recognized in a respected CEQA treatise, "[t]he summary-of-projections approach may present problems if the projections in the general plan or related planning document are inaccurate or outdated." (1 Kostka & Zischke, CEQA Practice, *supra*, § 13.39, p. 537.) Such is the case here. Both of the shopping center projects required amendment of the general plan. The addition of large regional shopping centers such as Gosford and Panama are not accounted for in the projections. We need not comment on the propriety of using the list of projects method for some aspects of cumulative impacts analysis and using the summary of projections for other aspects because, under either method, the cumulative impacts section is underinclusive. (*Id.* at § 13.39, pp. 537–538.)

Proper cumulative impacts analysis is absolutely critical to meaningful environmental review of the shopping center projects. Four analogous cases support our conclusion that the EIR's are legally inadequate due to their underinclusive and misleading cumulative impacts analysis.

In *Reasonable Growth, supra,* 151 Cal.App.3d 61, the appellate court ordered an EIR prepared for a high-rise project to be decertified because it underestimated the amount of new downtown development and consequently had not evaluated "the true severity and significance" of the cumulative impacts. (*Id.* at p. 80.) The court explained that the danger created by providing understated information subverts an agency's ability to adopt appropriate and effective mitigation measures, skews its perspective concerning the benefits of the particular projects under consideration and precludes it from gaining a true perspective on the consequences of approving the project. (*Ibid.*)

Similarly, in *Farm Bureau, supra,* 221 Cal.App.3d 692, this court determined that limiting the scope of cumulative impacts analysis to the mid-San Joaquin Valley was unduly restrictive and resulted in an inaccurate minimization of the cumulative impacts on air quality resulting from construction of the proposed cogeneration plan together with the many other proposed energy projects. (*Id.* at pp. 721–724.)

Next, in *Raptor, supra,* 27 Cal.App.4th 713, we invalidated an EIR prepared for a housing project, in part because it failed to analyze the project in conjunction with other development projects in the surrounding area. (*Id.* at pp. 739–741.)

Most recently, in *Eel River, supra,* 108 Cal.App.4th 859, the court found that an EIR considering a project to divert water was legally inadequate because the cumulative impacts analysis did not take into account other pending proposals that would curtail water diversions. The court concluded that it was "reasonable and practical" to include other pending curtailment proposals in the cumulative impacts analysis and that this omission resulted in an EIR that failed to alert decision makers and the public to the possibility that the agency would not be able to supply water to its customers in an environmentally sound way. (*Id.* at pp. 868–872.)

Following and applying these authorities, we likewise conclude that the EIR's are inadequate because they did not analyze the cumulative environmental impacts of other past, present and reasonably foreseeable retail projects in the market areas served by the proposed shopping centers. Neither EIR meaningfully addressed comments stating that the two shopping centers will have cumulative adverse impacts. As a result, the cumulative impacts analyses in both EIR's are underinclusive and misleading.

The record raises numerous questions respecting the type and severity of cumulative adverse environmental impacts that likely will result from the two shopping centers. Topics such as traffic, noise, air quality, urban decay and growth inducement immediately surface.[9] City and developers cannot fault BCLC because it does not have evidence answering these and other questions related to the cumulative impacts resulting from construction and operation of both Gosford and Panama. "To conclude otherwise would place the burden of producing relevant environmental data on the public rather than the agency and would allow the agency to avoid an attack on the adequacy of the information contained in the report simply by excluding such information." (*Farm Bureau, supra,* 221 Cal.App.3d 692, 724.)

On remand, each EIR must analyze the cumulative impacts resulting from construction and operation of the proposed shopping center in conjunction with all other past, present or reasonably foreseeable retail projects that are or will be located within the proposed project's market area. This includes, but

---

[9] Specific questions such as the following immediately come to mind: How will traffic patterns be affected on the shared roadways? Will combined traffic cause an increase in mobile emissions that adversely affects sensitive receptors? Will the presence of two shopping centers containing large value-oriented retailers result in an overall increase in shoppers who may come from outlying areas because of the abundance of retail opportunities in a relatively small area? In other words, is there a synergy whereby one and one equals more than two? Alternatively, will Gosford and Panama draw customers from each other, thereby increasing the potential that one of the shopping centers will not be successful and could deteriorate? Does addition of multiple new shopping facilities stimulate growth in the surrounding area and if so, what type?

is not limited to, analysis of the combined adverse impacts resulting from construction and operation of Gosford and Panama.[10]

### V. *Failure to Correlate Adverse Air Quality Impacts to Resulting Adverse Health Impacts*

The Gosford EIR concluded that Gosford would cause significant unavoidable direct adverse impacts to regional air quality from construction and operation. The direct adverse air quality impacts are derived "primarily from automobile emissions during operation and from architectural coatings and construction equipment during construction phase. No feasible mitigation measures are available that would reduce impacts to less than significant levels." Furthermore, Gosford "could potentially result in cumulatively considerable impacts to regional air quality from construction and operation."

Similarly, the Panama EIR concluded that Panama "may result in an overall increase in the local and regional pollutant load due to direct impacts from vehicle emissions and indirect impacts from electricity and natural gas consumption. This impact is considered significant and unavoidable for ROG and NOx." The Panama EIR reached a different conclusion than the Gosford EIR with respect to cumulative impacts, determining that a "less than significant" impact would occur in this regard.

BCLC contends that both EIR's omitted relevant information when they failed to correlate the identified adverse air quality impacts to resultant adverse health effects. We agree.

Guidelines section 15126.2, subdivision (a) requires an EIR to discuss, inter alia, "health and safety problems caused by the physical changes" that the proposed project will precipitate. Both of the EIR's concluded that the projects would have significant and unavoidable adverse impacts on air quality. It is well known that air pollution adversely affects human respiratory health. (See, e.g., Bustillo, *Smog Harms Children's Lungs for Life, Study Finds*, L.A. Times (Sept. 9, 2004).) Emergency rooms crowded with wheezing sufferers are sad but common sights in the San Joaquin Valley and elsewhere. Air quality indexes are published daily in local newspapers, schools monitor air quality and restrict outdoor play when it is

---

[10] This conclusion obviates any need to address BCLC's other claims concerning the sufficiency of the cumulative impacts analyses. However, we mention that when the City assesses the combined effects that the two shopping centers will have on ambient air quality, it must apply the principles we explained in *Farm Bureau, supra*, 221 Cal.App.3d 692. The magnitude of the current air quality problems in the San Joaquin Valley cannot be used to trivialize the cumulative contributions of the shopping centers and the scope of the analysis cannot be artificially limited to a restricted portion of the air basin. (*Id.* at pp. 718, 723.)

especially poor and the public is warned to limit their activities on days when air quality is particularly bad. Yet, neither EIR acknowledges the health consequences that necessarily result from the identified adverse air quality impacts. Buried in the description of some of the various substances that make up the soup known as "air pollution" are brief references to respiratory illnesses. However, there is no acknowledgement or analysis of the well-known connection between reduction in air quality and increases in specific respiratory conditions and illnesses. After reading the EIR's, the public would have no idea of the health consequences that result when more pollutants are added to a nonattainment basin. On remand, the health impacts resulting from the adverse air quality impacts must be identified and analyzed in the new EIR's.

## VI. *Prejudice*

"When the informational requirements of CEQA are not complied with, an agency has failed to proceed in 'a manner required by law.'" (*Peninsula, supra,* 87 Cal.App.4th at p. 118.) If the deficiencies in an EIR "preclude[] informed decisionmaking and public participation, the goals of CEQA are thwarted and a prejudicial abuse of discretion has occurred." (*Id.* at p. 128.)

An EIR's role "as an environmental 'alarm bell' whose purpose it is to alert the public and its responsible officials to environmental changes before they have reached ecological points of no return" (*County of Inyo v. Yorty* (1973) 32 Cal.App.3d 795, 810 [108 Cal.Rptr. 377]) is equally vital whether one is protecting our coastline and forests or preserving our inland neighborhoods as viable communities. For many of us, adverse environmental impacts such as reduction of endangered species habitat are regrettable but largely abstract harms. In contrast, deterioration of our local communities is a very real problem that directly impacts the quality of our daily life. When our morning commutes are marred by the sight of numerous vacant or half-vacant strip malls adorned with graffiti and weeds, when we hesitate to move into an established neighborhood because of the absence of close and convenient shopping and when it hurts to take a deep breath on hot August afternoons because of the poor air quality, the importance of thorough environmental analysis and complete disclosure before new projects are approved is all too evident.

In this case, City's failure to assess whether the shopping centers, individually and cumulatively, will indirectly cause urban decay, to evaluate the cumulative impacts of both shopping centers and to correlate the adverse air quality impacts to resulting adverse health consequences, cannot be dismissed as harmless or insignificant defects. As a result of these omissions, meaningful assessment of the true scope of numerous potentially serious adverse

environmental effects was thwarted. No discrete or severable aspects of the projects are unaffected by the omitted analyses; the defects relate to the shopping centers in their entirety, not just to one specific retailer. These deficiencies precluded informed public participation and decision making. Therefore, certification of the EIR's was a prejudicial abuse of discretion. (*Peninsula, supra,* 87 Cal.App.4th at p. 128.)

■ The Guidelines unequivocally require the lead agency to certify a legally adequate final EIR prior to deciding whether or not to approve or carry out a contested project. (Guidelines, §§ 15089 to 15092.) "[T]he ultimate decision of whether to approve a project, be that decision right or wrong, is a nullity if based upon an EIR that does not provide the decision-makers, and the public, with the information about the project that is required by CEQA." (*Santiago County Water Dist. v. County of Orange* (1981) 118 Cal.App.3d 818, 829 [173 Cal.Rptr. 602].) Thus, the project approvals and associated land use entitlements also must be voided. (See, e.g., *Eel River, supra,* 108 Cal.App.4th at p. 882; *Raptor, supra,* 27 Cal.App.4th at pp. 742–743.)

VII.–IX.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgments are reversed and the actions are remanded to the Superior Court of Kern County. BCLC is awarded its statutory costs in both actions. C & C is to pay the entirety of the cost award in the Gosford action; P99 is to pay the entirety of the cost award in the Panama action. (Cal. Rules of Court, rule 27(a)(4).) BCLC's request for judicial notice is granted.

Upon remand, the superior court is directed as follows in both actions:

(1) To issue new peremptory writs of mandate ordering the City to void its certification of the EIR's and findings of overriding considerations and to void its approval of the projects and associated zoning changes, general plan amendments and other related land use entitlements;

(2) To issue orders, after notice and hearing, that set a date by which the City must certify new EIR's in accordance with CEQA standards and procedures, including provisions for public comment, and make any findings

---

*See footnote, *ante*, page 1184.

that CEQA may require. These orders are to require the City, after full CEQA compliance is effected, to determine upon further consideration and in accordance with all applicable laws, whether or not to reapprove the projects and grant associated zoning changes, general plan amendments and land use entitlements. The City may require modification of the projects and/or additional mitigation measures as conditions of reapproval; it may require completed portions of the projects to be changed or removed;

(3) To determine, after notice and hearing, whether continuance of construction and retail activities on the project sites prior to full CEQA compliance and reapproval will prejudice the consideration or implementation of particular mitigation measures or alternatives to the project and to issue appropriate relief pursuant to section 21168.9. As part of this determination it is to consider the following: (i) continuance of construction activities, other than those necessary to ensure safety; (ii) continued operation of businesses that currently are open to the public; (iii) opening of new businesses; (iv) expansion of existing businesses;

(4) To determine, after notice and hearing, whether BCLC should be awarded attorney fees and costs pursuant to Code of Civil Procedure section 1021.5, the proper amounts, the party or parties against whom the fee awards should be assessed and to issue appropriate orders.

Wiseman, J., and Levy, J., concurred.