Filed 12/16/22 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE LAFAYETTE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LAFAYETTE et al.,<br><br>    Defendants and Respondents;<br><br>O'BRIEN LAND COMPANY LLC, et al.,<br><br>    Real Parties in Interest and Respondents. | A164394<br><br>(Contra Costa County<br>Super. Ct. No. MSN-20-1413) |

**THE COURT**[*]:

Respondent's petition for correction of the opinion, filed December 2, 2022, is granted. Appellant's petition for rehearing, filed December 15, 2022, is denied.

It is ordered that the opinion filed November 30, 2022, be modified as follows:

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II (items 2–5 of this).

[*] Tucher, P.J., Fujisaki, J., Petrou, J. participated in the decision.

1

1. On page 14 of the opinion, the words "Save Livermore" in the first sentence of the first full paragraph shall be changed to "Save Lafayette."

2. On page 18 of the opinion, the first sentence of the final paragraph will be changed to read:

> When some changes or additions to a previously certified EIR are necessary but none of the conditions calling for a subsequent EIR has occurred, the agency must prepare an addendum.

3. On page 28 of the opinion, the following footnote shall be inserted at the end of the first full paragraph, after "(§ 21166.)":

> Save Lafayette argues in its petition for rehearing that an SEIR is necessary because Dr. Smallwood's proposed mitigation measures for window collisions qualify as "[m]itigation measures or alternatives which are considerably different from those analyzed in the previous EIR [that] would substantially reduce one or more significant effects on the environment," which the project proponent did not adopt. (Guidelines, § 15162, subd. (a)(3)(D).) Save Lafayette takes the quoted language out of context. Section 15162, subdivision (a) of the Guidelines provides that no SEIR is necessary unless there are substantial changes to the project or its circumstances or unless "[n]ew *information* of substantial importance, *which was not known and could not have been known with the exercise of reasonable diligence at the time the previous EIR was certified as complete*," shows one of several circumstances. (Italics added.) The presence of considerably different mitigation measures that would reduce one or more significant environmental effects is one of those circumstances, but the proposed mitigation measures require preparation of an SEIR only if they could not, with the exercise of reasonable diligence, have been known when the EIR was certified. (*Id.*, subd. (a)(3)(D).)

4. On page 31 of the opinion, the quote at the top of the page shall be changed to read:

> " 'impair implementation or physically interfere with an adopted emergency response plan or emergency evacuation plan.' "

5.      On page 36 of the opinion, the acronym for *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 531–532 should be changed to (*CREED*) in both locations.

There is no change in the Judgment.

Dated:      December 16, 2022            ____TUCHER, P.J._____
                                         TUCHER, P.J.

*Save Lafayette v. City of Lafayette et al.* (A164394)

3

Trial Court:          Contra Costa County Superior Court

Trial Judge:         Hon. Barry Baskin

Counsel:             Louzeau Drury, Richard Drury, Rebecca Davis, Victoria Yundt; and Lason, Scott Sommer for Plaintiff and Appellant

Coblentz, Patch, Duffy & Bass, Jonathan R. Bass, Katharine Van Dusen, and Robert B. Hodil for Defendants and Respondents

Miller Starr Regalia, Arthur F. Coon, Bryan W. Wenter, Matthew C. Henderson for Real Party in Interest.

Filed 11/30/22 (unmodified version)

**CERTIFIED FOR PARTIAL PUBLICATION[\*]**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAVE LAFAYETTE,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>CITY OF LAFAYETTE et al.,<br><br>    Defendants and Respondents;<br><br>O'BRIEN LAND COMPANY, LLC, et al.,<br><br>    Real Parties in Interest and Respondents. | A164394<br><br>(Contra Costa County<br>Super. Ct. No. MSN-20-1413) |

O'Brien Land Company, LLC (the applicant or O'Brien) completed an application for a housing development project in 2011, and the City of Lafayette (the City) certified an environmental impact report (EIR) in 2013. Before the project was approved, the applicant and the City agreed to suspend processing of the original project while the applicant pursued an alternative, smaller proposal. In 2018, when it proved impossible to proceed with the alternative project, O'Brien and the City revived the original proposal, with some modifications. The City finally approved the resumed project in 2020, after preparation of an addendum to the original EIR.

---

[\*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of part II.

1

A citizen's group calling itself Save Lafayette petitioned for a writ of mandate, claiming that the project conflicts with the City's general plan as it existed when the project was revived in 2018, that the EIR is inadequate as an informational document, and that a supplemental EIR (SEIR) is required. Save Lafayette appeals the trial court's denial of its petition.[1] In the published portion of this opinion, we conclude that, despite the lengthy delay between certification of the EIR and project approval, the City properly applied the general plan standards in effect when the application was deemed complete. In the unpublished portion, we consider and reject all of Save Lafayette's challenges to the EIR. We therefore affirm the judgment.

## FACTUAL AND PROCEDURAL BACKGROUND

O'Brien submitted an application in March 2011 for approval of the Terraces of Lafayette Project (the apartment project or Terraces of Lafayette), a 315-unit residential development. The City notified O'Brien that its application was deemed complete on July 5, 2011.

As proposed, the apartment project included 14 residential buildings, a clubhouse, a leasing office, parking in carports and garages, and internal roadways. Its location was a 22.27-acre site in Lafayette, bounded by Pleasant Hill Road to the east, State Highway 24 to the south, and Deer Hill Road to the north and west.

At the time the application was deemed complete, the project site was designated Administrative/Professional/Multi-Family Residential on the City's general-plan land-use map and was zoned Administrative/Professional

---

[1] The petition named the City, the Lafayette City Council, and the Lafayette Planning Commission as respondents, and O'Brien Land Company, LLC and Anna Maria Dettmer as trustee for the AMD Family Trust as real parties in interest. We shall refer to these parties collectively as respondents.

2

Office in the City's municipal code, a zoning that allowed multi-family developments with a land use permit.

An EIR was prepared for the apartment project, and the City certified the EIR on August 12, 2013. However, the City's Design Review Commission recommended that the Planning Commission deny the application for a land use permit.

The applicant and City staff then began to consider a lower-density alternative to the apartment project, consisting of 44 or 45 single-family detached homes, public parkland, and other amenities (the project alternative). As part of their discussions, the applicant and the City entered into an "Alternative Process Agreement" (the process agreement) on January 22, 2014.

The expressed purpose of the process agreement was to establish a process for considering the project alternative; to "suspend" the apartment project in the meantime; and to "preserve" all of the parties' "rights and defenses . . . with regard to the Apartment Project" until the City made a determination on the project alternative. Specifically, the parties agreed that the City would "suspend the processing of the Apartment Project pending [the] City's processing of the Project Alternative," and that if the City Council did not approve the project alternative, or if an appeal, challenge, or referendum was not resolved in a manner acceptable to the applicant, the applicant could terminate the process agreement and the City's processing of the apartment project application would immediately resume, with the parties situated as they were before the application was suspended. The process agreement recited that, "because the Parties have mutually agreed to toll the processing of the Apartment Project, [the] City has not failed to act to approve or disapprove the Apartment Project under the Permit Streamlining

3

Act, and the Apartment Project shall not be deemed approved under the Permit Streamlining Act."

The City certified an SEIR for, and approved, the project alternative (known as the "Homes at Deer Hill") on August 10, 2015. It also adopted a general plan amendment changing the project site's land use designation from Administrative Professional Office (APO), which allows 35 dwelling units per acre, to Low Density Single Family Residential (SFR-LD), which allows only two units per acre. The City then adopted ordinance No. 641, changing the zoning designation of the site from APO to Single Family Residential (R-20).

Save Lafayette filed a petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5) on September 8, 2015, challenging approval of the Homes at Deer Hill based on alleged violations of the California Environmental Quality Act (Pub. Res. Code, § 21000 et seq. (CEQA)). In January 2016, the parties entered into a settlement agreement and Save Lafayette dismissed the action with prejudice. Acting under permits, the applicants then demolished the buildings and structures on the project site and removed 48 of the 117 trees on the site.

A referendum petition challenging the City Council's approval of the zoning ordinance and requesting that the ordinance be either repealed or submitted to a vote was soon filed. The City Council declined to take either course, so Save Lafayette filed a petition for writ of mandate. The trial court denied the petition but on February 21, 2018, our colleagues in Division Four of this court reversed, concluding the City could not properly keep the referendum off the ballot. (*Save Lafayette v. City of Lafayette* (2018) 20 Cal.App.5th 657, 662, 671–672.) On June 5, 2018, the zoning ordinance appeared on the ballot and a majority of Lafayette voters rejected it. The

4

next month, the City Council adopted Ordinance No. 668, zoning the site Single-family Residential District-65 (R-65) (i.e., requiring lot sizes more than three times larger than those the voters had rejected).

On June 15, 2018, O'Brien submitted a letter notifying the City that it was terminating the process agreement and withdrawing the project alternative applications, and asking the City to resume processing the apartment project application. As resumed, the project (the resumed project) differed somewhat from the apartment project originally proposed. Pertinent here, the resumed project would preserve 10 fewer trees than the original project (16 rather than 26) and would plant approximately 68 more new trees than the 700 originally planned.

The applicant's consultant, FirstCarbon Solutions, prepared an addendum to the original EIR for the resumed project in 2018. (14 Cal. Code Regs., § 15164.) The City hired another consultant, Impact Sciences, to review FirstCarbon's addendum. Impact Sciences concluded there had been no substantial changes in the project or its circumstances requiring major revisions to the certified 2013 EIR, so that an addendum rather than an SEIR was appropriate. However, it concluded further analysis was necessary. Impact Sciences then prepared a new addendum (the addendum), which was released in May 2020 and revised in June 2020.

The City certified the addendum as revised, and approved the renewed project on August 24, 2020. In so doing, it concluded the project qualified as a " 'housing development project' 'for very low, low-, or moderate-income households' " under the Housing Accountability Act. (Gov. Code, § 65589.5 (HAA); see *id*., subds. (d) & (h)(3).) As a result, the City found, the HAA preempted conflicting requirements of the Lafayette Municipal Code, and the

5

project was exempt from certain findings the City normally required in order to obtain the necessary permits.

Save Lafayette filed its petition for writ of mandate on September 23, 2020, alleging that, in violation of CEQA, the 2013 EIR did not adequately analyze a number of environmental impacts—including the presence of special-status species, the risk of wildfire, and the destruction of mature trees—and that an SEIR was necessary. It also alleged the project was inconsistent with applicable general plan and zoning requirements.

The trial court denied the petition. As to Save Lafayette's contentions under CEQA, the court ruled in its favor on two preliminary matters—concluding Save Lafayette was entitled to challenge the 2013 certification of the EIR, and that the dismissal of the 2015 lawsuit did not act as res judicata to bar Save Lafayette from challenging the 2013 EIR. But the court ruled against Save Lafayette on the merits, rejecting all of its challenges to the adequacy of the EIR. The court also found that, despite the delay while the parties pursued the smaller Homes at Deer Hill project, respondents were entitled under the HAA to the benefit of the zoning in place when the application for the apartment project was deemed complete in 2011.

The trial court entered judgment in respondents' favor on January 4, 2022. This timely appeal ensued.

## DISCUSSION

Before considering the CEQA challenge, we turn our attention to the argument that the City of Lafayette should not have approved the resumed project because the site is now zoned for single-family homes on large lots.

## I.    General Plan and Zoning Consistency

Save Lafayette contends the project as approved is inconsistent with the site's current general-plan land-use designation and with its zoning.

6

Save Lafayette argues the project is governed by the standards in effect in 2018, when the applicant terminated the process agreement and asked the City to resume processing its application, not by the standards that existed in 2011, when its application was deemed complete. This argument requires us to consider the interplay among the laws governing general plans and zoning, the HAA, and the Permit Streamlining Act. (Gov. Code, § 65920 et seq. (PSA).)

### A. *Legal Background*

Each city and county in California must have a general plan for its physical development (Gov. Code, § 65300) and local land use decisions, including zoning ordinances, must be consistent with it. (*Id.*, § 65860, subd. (a); *Fonseca v. City of Gilroy* (2007) 148 Cal.App.4th 1174, 1182.) In turn, land use permits must be consistent with a site's zoning. (*Land Waste Management v. Contra Costa County Bd. of Supervisors* (1990) 222 Cal.App.3d 950, 959.)

In the HAA, our Legislature has established limited exceptions to these general rules. The HAA was enacted in 1982 in an effort to address the state's shortfall in building housing approximating regional needs, and the Legislature has amended the law repeatedly in an increasing effort to compel cities and counties to approve more housing. (*California Renters Legal Advocacy & Education Fund v. City of San Mateo* (2021) 68 Cal.App.5th 820, 834–835 (*California Renters*).)

The HAA provides that when a proposed housing development complies with objective general-plan, zoning, and subdivision standards and criteria in effect *at the time the application is deemed complete*, the local agency may disapprove the project or require lower density only if it finds the development would have specific adverse effects on public health or safety

7

that cannot feasibly be mitigated.  (*California Renters*, *supra*, 68 Cal.App.5th at p. 835; *Honchariw v. County of Stanislaus* (2011) 200 Cal.App.4th 1066, 1074–1075; Gov. Code, § 65589.5, subd. (j)(1).)  Of particular relevance here, a local agency may not disapprove (or approve in a manner that renders infeasible) a housing development project for very low-, low-, or moderate-income households unless it finds, *inter alia*, that the project is inconsistent with the zoning ordinance and the general-plan land-use designation existing when the application was deemed complete.  (Gov. Code, § 65589.5, subd. (d)(5).)[2]  Thus, even if a project is inconsistent with the *current* general plan or zoning standards, under the HAA it may need to be approved if it was

_____

[2] Subdivision (d)(5) of section 65589.5 currently provides, as one of the permissible grounds for disapproving or reducing the density of a housing development project for very low-, low- or moderate-income households, that the project "is inconsistent with both the jurisdiction's zoning ordinance and general plan land use designation as specified in any element of the general plan as it existed on the date the application was deemed complete, and the jurisdiction has adopted a revised housing element in accordance with Section 65588 that is in substantial compliance with this article.  For purposes of this section, a change to the zoning ordinance or general plan land use designation subsequent to the date the application was deemed complete shall not constitute a valid basis to disapprove or condition approval of the housing development project or emergency shelter."  The final sentence of this provision was added effective January 1, 2018.  (Stats. 2017, ch. 368, § 1 (Sen. Bill 167); Stats. 2017, ch. 373, §1 (Assem. Bill 678).)  Save Lafayette argues that the final sentence of this provision cannot be applied retroactively.  We question whether applying the full provision to a project approval in 2020 constitutes retroactive application of the 2018 amendment (see *Walnut Creek Police Officers' Assoc. v. City of Walnut Creek* (2019) 33 Cal.App.5th 940; *Citizens for Positive Growth & Preservation v. City of Sacramento* (2019) 43 Cal.App.5th 609, 626), but in any event, we need not consider this contention because the added sentence only reinforces the rule already set forth in the statute:  a project must be judged by the planning and zoning standards that existed when the application was deemed complete, not by any later changes to those standards.

8

consistent with standards existing when the application was deemed complete.

Finally, the Permit Streamlining Act addresses processes for permitting housing and other development projects. (See Gov. Code, § 65920 et seq.) At least two aspects of the PSA are relevant here. First, the statute requires public agencies to specify up front what information an applicant for a development project must supply, and then the agency must review applications for completeness within 30 days of receiving them. (Gov. Code, §§ 65940, subd. (a)(1), 65943, subd. (a).) The PSA requires an agency to notify an applicant what information, if any, is missing, and then the process iterates if the applicant provides further information. "Upon receipt of any resubmittal of the application, a new 30-day period shall begin, during which the public agency shall determine the completeness of the application." (Gov. Code, § 65943, subd. (a).) If the agency does not determine in writing within 30 days whether an application for a development project is complete, "the application shall be deemed complete." (*Ibid.*) And whether an application is complete for purposes of the PSA is also relevant under the HAA, which incorporates by reference the PSA's definition of a complete application. (See Gov. Code, § 65589.5, subd. (h)(5).)

Once a development application is deemed complete, the PSA establishes deadlines for a public agency to approve or disapprove it, deadlines that vary with the extent of environmental review required. (Gov. Code, § 65950, subd. (a).) The longest timeline, which appears to apply here, runs 180 days from the time an EIR is certified. (Gov. Code, §§ 65950, subd. (a)(1).) The PSA allows only a single 90-day extension of that period. (Gov. Code, § 65957.) With exceptions not at issue here, "[n]o other extension, continuance, or waiver of these time limits either by the project

9

applicant or the lead agency shall be permitted," and "[f]ailure of the lead agency to act within these time limits may result in the project being deemed approved pursuant to the provisions of subdivision (b) of [Government Code] Section 65956," which establishes requirements for public notice. (Gov. Code, § 65957.) That is, if the agency fails to act within the statutory period and the applicant provides timely notice (enabling the agency to cure), the project may proceed without agency action, as if it had been approved. (Gov. Code, §§ 65956, subd. (b), 65957; *Linovitz Capo Shores LLC v. California Coastal Com.* (2021) 65 Cal.App.5th 1106, 1120.) The goal of the PSA is "to relieve permit applicants from protracted and unjustified delays in processing their permit applications." (*Riverwatch v. County of San Diego* (1999) 76 Cal.App.4th 1428, 1438 (*Riverwatch*).)

The Legislature added the prohibition on waiving the PSA's strict time limits in 1998, in response to our high court's decision in *Bickel v. City of Piedmont* (1997) 16 Cal.4th 1040, 1043, 1048–1052, which had held that applicants could waive the PSA's time limits. The applicants in *Bickel* sought to remodel their house and encountered opposition. After a number of continuances over the course of almost two years—continuances the applicants either sought or agreed to—the planning commission denied the application. The applicants then claimed their application was deemed approved by operation of law under the PSA's time limits, a contention the city council and superior court rejected. (*Id.* at pp. 1044–1046.) On review, the high court considered whether an applicant could waive the PSA's time limits, and answered in the affirmative. It reasoned that the time limits primarily benefit the applicant (*id.* at pp. 1048–1049) and that nothing in the PSA's language "prohibits an applicant from voluntarily relinquishing, for the applicant's own benefit . . ., the right to an agency decision within the

10

statutory time limits" (*id*. at p. 1052). Upholding the trial court's finding that the applicants had waived the PSA's time limits, the high court rejected the argument that the project was deemed approved. (*Id*. at pp. 1052–1054.)

The following year, the Legislature responded by amending Government Code section 65957 to specify that the PSA's time limits may not be waived by either the project applicant or the lead agency. (Sen. Bill 2005, Stats. 1998, ch. 283, § 4.) In an uncodified portion of the legislation, the Legislature declared that it was aware of *Bickel*, and that it intended to clarify that the PSA "does not provide for the application of the common law doctrine of waiver by either the act's purpose or its statutory language." (Sen. Bill, 2005, Stats. 1998, ch. 283, § 5; see *Riverwatch*, *supra*, 76 Cal.App.4th at p. 1439.)

### B. Analysis

Save Lafayette does not dispute that the apartment project, when originally proposed, was consistent with the zoning and general plan designations for the site in 2011. And nobody disputes that the project is inconsistent with the zoning and general plan designations in effect on June 15, 2018, when the applicant terminated the process agreement and asked the City to resume processing a variant of its original application. The question before us is whether, under the HAA, the general plan and zoning standards in effect when the application was deemed complete in 2011 govern the project, or whether the PSA's time limits deprived the City of the power to act on the application, such that the applicant must be treated as if it had resubmitted its application when it asked the City to resume processing an apartment application in 2018.

This is fundamentally a legal issue, which requires us to decide how the HAA and the PSA apply to undisputed facts. We thus conduct our review of

11

this question de novo. (See *Peterson v. Wells Fargo Bank, N.A.* (2015) 236 Cal.App.4th 844, 850.) In carrying out this review, we bear in mind that, at least to the extent we must construe the HAA, the Legislature has instructed that its provisions "be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing." (Gov. Code, § 65589.5, subd. (a)(2)(L); *California Renters*, *supra*, 68 Cal.App.5th at p. 836.)

The PSA includes no provision for " 'suspend[ing]' " consideration of a project, as contemplated by the process agreement. We thus assume for purposes of our analysis that the multi-year delay following the process agreement violated the PSA. But that does not mean we agree with Save Lafayette that the application's 2011 " 'substantially complete' " determination lapsed under the PSA, or that the City lost power to act on the application 180 or 270 days after certifying the EIR. According to Save Lafayette, the applicant's request to resume processing should be treated as a resubmission in June 2018 of its project application, or the application should be deemed resubmitted and reviewed under the standards in effect on a new " 'deemed complete' " date.

In practical effect, Save Lafayette's interpretation would mean the application was deemed disapproved by operation of law when the City failed to act on it within 180 or 270 days. But the PSA says no such thing. Rather, the consequence the statutory scheme provides for failure to act is that a project is deemed *approved*, if notice requirements are met. (Gov. Code, §§ 65956, subd. (b), 65957.) Specifically, if an agency fails to approve or disapprove a development project within 180 or 270 days after certifying an EIR, the applicant may elect to provide the necessary public notice, including a description of the proposed development and its location, the permit

12

application number, the name and address of the permitting agency, and a statement that the project will be deemed approved if the permitting agency does not act within 60 days of the notice. (Gov. Code, § 65956, subd. (b).)

An argument could be made that the PSA, taken as a whole, forces a choice on an applicant where the agency does not act promptly on a complete application: either provide public notice under Government Code section 65956 or submit to an application lapsing, thus losing the benefit of the HAA. That is not an impossible reading of the statutory scheme, but neither does the PSA compel this conclusion. Even less does it compel a conclusion that an agency implicitly loses power to act on an application once the statutory time limits pass. We reject Save Lafayette's reading of the statute for four reasons.

First is the fact that the statute nowhere states that an application is deemed withdrawn, deemed disapproved, or deemed resubmitted at a later date if, after the agency fails to act within the PSA's time limits, the applicant fails to perfect its right to "deemed approval." (See Gov. Code, § 65956, subd. (b).) Given that the statute is elsewhere explicit about deeming an application complete or deeming it approved (Gov. Code, §§ 65943, subd. (a), 65956, subd. (b)), we consider this silence significant.

Second is the implausibility of the argument Save Lafayette makes in favor of restarting the clock in 2018. Save Lafayette contends that the applicant's request for continued permit processing on the resumed project served as a resubmittal of the project application, and that the application should be deemed complete on the date of this ostensible resubmittal. For this view, Save Lafayette relies on Government Code section 65943, the PSA's provision for determining an application's completeness. In particular, it quotes the language we quoted above: "Upon receipt of any resubmittal of

13

the application, a new 30-day period shall begin, during which the public agency shall determine the completeness of the application." (*Id*., subd. (a).) But in the context of the statute, a "resubmittal of the application" refers to a resubmittal in response to a notice that an application is incomplete, after which the agency has an additional 30 days to assess the application's completeness. (Gov. Code, § 65943, subd. (a); see *Orsi v. City Council* (1990) 219 Cal.App.3d 1576, 1586 [statutory language and legislative history "make clear that the Legislature in discussing 'resubmittals' was referring to applications that were resubmitted after the lead agency made a timely finding that the application as originally submitted was incomplete"].) That is not what happened here, where the City found the application to be complete in 2011, no resubmission was required, and no reevaluation of the application's completeness occurred.

The third reason we reject Save Livermore's construction of the statute is that it stands in tension with the provision of the PSA that expressly addresses disapproval of applications. Government Code section 65952.2 states that "[a]ny disapproval of an application for a development project shall specify reasons for disapproval other than the failure to timely act in accordance with the time limits" of the PSA. If the 2011 project application were deemed disapproved, that disapproval would only be because of the City's failure to "act in accordance with the time limits" of the PSA. (*Ibid*.) And, of course, such a silent disapproval would have occurred without anyone "specify[ing] reasons" for it. (*Ibid*.)

Our fourth reason for construing the PSA to avoid deemed disapproval here is because we are not dealing with the PSA in a vacuum, but rather in its relation to the HAA. The Legislature has found that California has a "housing supply and affordability crisis of historic proportions" and that

14

millions of Californians are hurt by the "consequences of failing to effectively and aggressively confront this crisis." (Gov. Code, §65589.5, subd. (a)(2)(A).) The Legislative intended in adopting and subsequently expanding the HAA "to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects." (*Id*., subd. (a)(2)(K).) We are accordingly directed to interpret and implement the HAA to "afford the fullest possible weight to the interest of, and the approval and provision of, housing." (*Id*., subd. (a)(2)(L).) These considerations weigh in favor of fixing the date on which the application was complete on the date when the City actually made that determination—in 2011—rather than at some later date after the City had twice down-zoned the project site to allow for much less housing development.

Save Lafayette objects that this construction of the statute renders the Legislature's post-*Bickel* amendment of the PSA an idle act. When the Legislature amended the statute to specify that its time limits cannot be waived (Sen. Bill 2005, Stats. 1998, ch. 283, § 4 [amending Gov. Code, § 65957]), Save Lafayette protests, the Legislature must have meant for the agency to lose the power to act on an application after the statutory time limits have passed. We reject this logic. Certainly, the City should comply with the PSA. If it refuses, a writ might be in order. (See *Morris v. Harper* (2001) 94 Cal.App.4th 52, 58; Gov. Code, § 65956 [inviting action pursuant to Code Civ. Proc., § 1085]; *LT-WR, L.L.C. v. California Coastal Com.* (2007) 152 Cal.App.4th 770, 789 [writ relief available to compel Coastal Commission to decide permit application after deadline passed].) But Save Lafayette points us toward no statutory or case authority for the proposition that, by failing to

15

comply with the time limits of the PSA, the City loses the power to act on a project application entirely. Indeed, the default rule is that unless the Legislature clearly expresses a contrary intent, an agency does not lose jurisdiction to act even after a statutory deadline passes. (*LT-WR*, *L.L.C.*, at p. 788, citing *California Correctional Peace Officers Assn. v. State Personnel Bd.* (1995) 10 Cal.4th 1133, 1145, 1147.)

We therefore reject Save Lafayette's contention that O'Brien lost the benefit under the HAA of having submitted a complete application in 2011, after the City failed to approve the project within 270 days of certifying the EIR. The trial court rightly refused to disturb the City's approval of the resumed project; its inconsistency with the general plan and zoning standards of June 2018 was immaterial. O'Brien got a complete project application on file in 2011, and the HAA requires that such a project be assessed against 2011 general plan and zoning standards.

## II.   CEQA Issues

### A. Legal Landscape

In its CEQA challenges, Save Lafayette contends that the 2013 EIR did not adequately examine three environmental impacts, and that respondents were required to prepare an SEIR rather than an addendum in 2020. In considering these contentions, we review the City's action, not the trial court's decision. (*Tiburon Open Space Committee v. County of Marin* (2022) 78 Cal.App.5th 700, 727 (*Tiburon*).)

With narrow exceptions, CEQA requires preparation of an EIR " 'whenever a public agency proposes to approve or to carry out a project that may have a significant effect on the environment. [Citations.]' [Citations.] The basic purpose of an EIR is to 'provide public agencies and the public in general with detailed information about the effect [that] a proposed project is

16

likely to have on the environment; to list ways in which the significant effects of such a project might be minimized; and to indicate alternatives to such a project.' [Citations.] 'Because the EIR must be certified or rejected by public officials, it is a document of accountability. If CEQA is scrupulously followed, the public will know the basis on which its responsible officials either approve or reject environmentally significant action, and the public, being duly informed, can respond accordingly to action with which it disagrees.' " (*Sierra Club v. County of Fresno* (2018) 6 Cal.5th 502, 511–512, fn. omitted (*Fresno*).) Before approving a project, the lead agency must certify that the EIR has been completed in compliance with CEQA, that the agency has reviewed and considered the EIR, and that the EIR reflects the agency's independent judgment and analysis. (14 Cal. Code Regs. § 15090, subd. (a).)

Once an EIR for a project has been prepared, the agency may not require a subsequent or supplemental EIR except in specific circumstances. An SEIR is required only if "[s]ubstantial changes are proposed in the project" or "occur with respect to the circumstances" of the project, "requir[ing] major revisions of the [EIR]" or, alternatively, if "[n]ew information" becomes available. (Pub. Res. Code, § 21166;[3] see 14 Cal. Code Regs., §§ 15162, subd. (a)[4] [subsequent EIR], 15163, subd. (a) [supplement to EIR]; *Committee for Re-Evaluation of T-Line Loop v. San Francisco Municipal Transportation Agency* (2016) 6 Cal.App.5th 1237, 1246

---

[3] All undesignated statutory references are to the Public Resources Code.

[4] The CEQA Guidelines are found at sections 15000 to 15387 of title 14 of the California Code of Regulations. We afford them great weight, unless clearly unauthorized or erroneous under CEQA. (*California Building Industry Assn. v. Bay Area Air Quality Management Dist.* (2015) 62 Cal.4th 369, 381.) We shall refer to them as the Guidelines.

17

(*Committee for Re-Evaluation*).) "New information" is that which "was not known and could not have been known" when the EIR was originally "certified as complete." (§ 21166, subd. (c).) And it must be "of substantial importance," for example because the new information shows "[s]ignificant effects . . . will be substantially more severe than shown in the previous EIR." (14 Cal. Code Regs., § 15162, subd. (a)(3).) "An agency that proposes project changes thus must determine whether the previous environmental document retains any relevance in light of the proposed changes and, if so, whether major revisions to the previous environmental document are nevertheless required due to the involvement of new, previously unstudied significant environmental impacts. These are determinations for the agency to make in the first instance, subject to judicial review for substantial evidence." (*Friends of College of San Mateo Gardens v. San Mateo County Community College Dist.* (2016) 1 Cal.5th 937, 944 (*San Mateo*); accord, *Committee for Re-Evaluation*, *supra*, 6 Cal.App.5th at pp. 1247–1248, 1251–1252.)

The agency is entitled to rely on the whole record in determining whether an SEIR is necessary. (*Friends of Davis v. City of Davis* (2000) 83 Cal.App.4th 1004, 1019.) "[T]here is no fixed format for an agency's analysis under section 21166"; while it may be helpful to substantiate this determination in a single document such as an addendum, the ultimate issue is whether the record as a whole supports the agency's determination. (*American Canyon Community United for Responsible Growth v. City of American Canyon* (2006) 145 Cal.App.4th 1067, 1083 (*American Canyon*).)

When some changes or additions to a previously certified EIR are necessary but none of the conditions calling for a subsequent EIR has occurred, the agency may prepare an addendum. (Guidelines, § 15164, subd. (a).) Unlike an SEIR, an addendum need not be circulated for public

review and comment, but it can be included in or attached to the final EIR, and the decisionmaking body must consider it before making a decision on the project. (Guidelines, § 15164, subds. (c), (d).) The addendum must explain why the agency decided to prepare an addendum rather than a supplemental EIR, and this explanation must be supported by substantial evidence. (Guidelines, § 15164, subd. (e); see *Mani Brothers Real Estate Group v. City of Los Angeles* (2007) 153 Cal.App.4th 1385, 1397 (*Mani Brothers*) [substantial evidence review applied to contention city should have used SEIR rather than addendum for modified project].)

Often, an agency will certify the EIR for a project and approve the project at the same hearing. (*Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184, 1200 (*Bakersfield Citizens*).) There is no requirement in CEQA, however, requiring this practice. CEQA simply requires that when, sometime after certifying an EIR, the lead agency decides to approve a project, the agency file a notice of determination indicating whether an EIR has been prepared and made available to the public, and whether the project will have a significant effect on the environment. (§ 21108, subd. (a), 21152.)

Finally, we may not interpret CEQA or the Guidelines in a manner that " 'imposes procedural or substantive requirements beyond those explicitly stated.' " (*Committee for Re-Evaluation*, *supra*, 6 Cal.App.5th at p. 1247, citing § 21083.1.)

### B. The Permit Streamlining Act Redux

In a variation on its argument that the City lacked authority to act on the resumed application because the PSA's time limits had expired, Save Lafayette contends the City violated CEQA's procedural requirements when

it relied on the " 'stale' " 2013 EIR rather than preparing an SEIR when the project was resumed in 2018. We reject this novel argument.

We have already explained that the PSA requires development projects to be approved or disapproved within specified times, the longest such time limit being 180 days after an EIR is certified plus one extension for up to 90 days. (Gov. Code, §§ 65950, subd. (a)(1), 65957.) Save Lafayette points out that CEQA has a similarly short time limit for bringing an action challenging an EIR (see § 21167), and it contends these provisions combine to prevent a project from being approved based on a " 'stale' " EIR. But CEQA's statute of limitations for challenging an EIR begins to run only when the agency files its notice of determination after approving a project (§ 21167, subd. (c)), which does not prevent an agency from allowing considerable time to elapse between its decisions certifying an EIR and approving a project.

Logically, Save Lafayette's argument would mean that an agency could not rely on an EIR that had been certified more than 180 or 270 days before a project's approval. CEQA contains no such prohibition, and the Legislature forbids us to interpret CEQA in a manner that "imposes procedural or substantive requirements beyond those *explicitly stated*" in CEQA or the Guidelines. (§ 21083.1, italics added; see *Berkeley Hillside Preservation v. City of Berkeley* (2015) 60 Cal.4th 1086, 1107–1108.) As "there is no indication the Legislature meant to modify or accelerate CEQA's procedures" in enacting the PSA (*Schellinger Brothers v. City of Sebastopol* (2009) 179 Cal.App.4th 1245, 1262), we decline to construe the time limitations in the PSA as creating an implied requirement *under CEQA* that a project may not be approved when its EIR is more than 270 days old. Without an express prohibition in CEQA on the course of action the City and O'Brien pursued, we cannot conclude CEQA forbids reliance on the original EIR, nor mandates

20

that it be updated with an SEIR. The statute and the Guidelines set forth the circumstances that require an SEIR, and the circumstance that the original EIR was certified more than 270 days previously is not among them. (§ 21166; see 14 Cal. Code Regs., § 15162, subd. (a).)

### C. Standard of Review

Save Lafayette next brings more conventional CEQA challenges, both to the legal sufficiency of the original EIR and to the City's decision not to prepare an SEIR. We employ different standards in reviewing these two decisions.

In reviewing the City's decision to certify the EIR, our inquiry extends only to whether there is a prejudicial abuse of discretion, which is established if the agency has not proceeded in a manner required by law or if its determination is not supported by substantial evidence. (*In re Bay-Delta etc.* (2008) 43 Cal.4th 1143, 1161.) We do not pass on the correctness of the environmental conclusions in the EIR, but only on its sufficiency as an informational document. (*Ibid.*) Our ultimate inquiry is "whether the EIR includes enough detail 'to enable those who did not participate in its preparation to understand and to consider meaningfully the issues raised by the proposed project.' " (*Fresno*, *supra*, 6 Cal.5th at p. 516.)

As this is a mixed question of law and fact, "it is generally subject to independent review. However, underlying factual determinations— including, for example, an agency's decision as to which methodologies to employ for analyzing an environmental effect—may warrant deference." (*Fresno*, *supra*, 6 Cal.5th at p. 516; see also *Tiburon*, *supra*, 78 Cal.App.5th at p. 728 [failure to comply with CEQA is reviewed independently, but factual determinations are reviewed for substantial evidence]; *County of Amador v. El Dorado County Water Agency* (1999) 76 Cal.App.4th 931, 945–946.) We do

not defer, however, in determining "whether statutory criteria were satisfied." (*Fresno, supra*, 6 Cal.5th at p. 516.) For example, we independently review "[w]hether a description of an environmental impact is insufficient because it lacks analysis or omits the magnitude of the impact." (*Id.* at p. 514.) Applying this principle, the court in *Fresno* concluded an EIR was inadequate as an informational document when it identified the health impacts of pollutants the project produced but did not indicate the concentrations at which such pollutants would trigger the identified symptoms, and did not identify the amount of ozone the project would produce. (*Id.* at pp. 519–521.)

As we have explained, a different standard of review governs the decision not to prepare an SEIR but to proceed by way of addendum to the previously certified EIR. This decision we review for substantial evidence. (Guidelines, § 15164, subd. (e); *Mani Brothers, supra*, 153 Cal.App.4th at p. 1397.) " 'Substantial evidence is defined as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." ' " (*Bakersfield Citizens, supra*, 124 Cal.App.4th at p. 1198; accord, *Tiburon, supra*, 78 Cal.App.5th at p. 728.) We resolve reasonable doubts in favor of the agency's findings and decision, and do not overturn its actions on the ground that a different conclusion would have been equally or more reasonable. (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1356.)

Save Lafayette contends the substantial evidence standard does not apply in our review of the City's decision not to prepare an SEIR because the City did not approve this project when it certified the EIR. Save Lafayette seizes on a few words in *San Mateo, supra*, 1 Cal.5th at p. 949, in which our

Supreme Court stated, "Once a project has been subject to environmental review *and received approval*, section 21166 and CEQA Guidelines section 15162 limit the circumstances under which a subsequent or supplemental EIR must be prepared." (Italics added.) That is because, the court explained, " '[t]he event of a change in a project is not an occasion to revisit environmental concerns laid to rest in the original analysis.' " (*Ibid*.)

Save Lafayette also relies on cases explaining that the limitations on supplemental review " 'come[] into play precisely because in-depth review has already occurred, *the time for challenging the sufficiency of the original EIR has long since expired* [citation], and the question is whether circumstances have changed enough to justify repeating a substantial portion of the process.' " (*American Canyon*, *supra*, 145 Cal.App.4th at p. 1072, italics altered, quoting *Bowman v. City of Petaluma* (1986) 185 Cal.App.3d 1065, 1073; accord, *Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1398.) As Save Lafayette accurately observes, the time for challenging the sufficiency of this EIR expired only recently. Indeed, no challenge to the sufficiency of the EIR was ripe until 2020, when the City finally approved the project. (See § 21167, subd. (c) [limitations period for action challenging EIR begins to run after project approval, with filing of notice of determination].) Save Lafayette therefore urges us to apply, instead of substantial evidence review, the standard for evaluating the sufficiency of an EIR as an informational document in the first instance.

Save Lafayette has found a few favorable phrases in precedent but taken them out of context. The cases on which Save Lafayette relies are inapposite because none addresses the effect of a delay between certification of an EIR and approval of a project. Certainly, none suggests that when an EIR has been certified but a project not approved, courts should employy

23

something other than the substantial evidence standard that normally governs in reviewing an agency's determination to update an EIR by addendum rather than SEIR.

The language of the statute and the Guidelines refutes Save Lafayette's argument. Section 21166 expressly limits the circumstances requiring an SEIR when an EIR has been "prepared" for a project—as certainly occurred here—and limits the "[n]ew information" circumstance to instances in which the information was not, or could not have been, known when the EIR was "certified as complete." (§ 21166, subd. (c).) Neither of these benchmarks— when an EIR is "prepared" or "certified as complete"—has any bearing on whether or when the project was approved. And turning to the CEQA Guidelines, we note they expressly distinguish between certification of an EIR and project approval. (Compare Guidelines, § 15162, subd. (a)(1)–(3) with Guidelines, § 15162, subd. (c).) Section 15162 of the Guidelines explains that when an EIR has been "certified," no SEIR shall be prepared unless one of the enumerated events has occurred—substantial changes to the project or its circumstances, or new information. (Guidelines, § 15162, subd. (a)(1)–(3).) Thus, the Guidelines contemplate that the rules for preparation of an SEIR apply independently of whether or when a project is approved.

We will accordingly apply the normal standard of review to the City's decision to proceed by way of addendum—that is, we review for substantial evidence. (*Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1397.) To the extent Save Lafayette's arguments challenge the adequacy of the EIR as an informational document, however, we will apply the standard of review described in *Fresno*.

24

### D. Special-Status Species on Project Site

The 2013 EIR reported that numerous animal species with special status had been recorded, or their presence was suspected to occur, in the vicinity of Lafayette. The applicant's consulting biologist considered a total of 23 such species to be potentially present on the site, including one invertebrate, 14 bird, and 8 bat species. The majority of these species' activities were likely limited to foraging, but it was possible they could establish nests or roosts before construction began, according to the EIR. The EIR reported that most of the special-status amphibian and reptile species known from the surrounding region, including the California tiger salamander, the California red-legged frog, and the western pond turtle, depended on aquatic habitat not found on the site or its vicinity. Nor, according to the EIR, did the site contain suitable habitat for other special-status mammal species, including the American badger.

The mitigation measures proposed by the EIR included conducting a survey for nesting raptors and migratory birds within 14 days before removing vegetation or beginning construction to identify active nests on the site and nearby; establishing an adequate setback around any nest location and restricting vegetation removal and construction until any young birds have fledged; not demolishing buildings during bats' winter roosting and pupping periods; surveying buildings before demolition to avoid " 'tak[ing]' " bats that have begun using a structure, and leaving doors and windows open until demolition if bats are present; assessing trees to be removed for roosting habitat no more than two weeks before removing the trees and clearing vegetation; and, to reduce further the effects of the project on wildlife, providing and enhancing an area of at least 25 feet from the centerline of the creek as natural habitat.

The 2020 addendum explained that the resumed project was generally similar to the original apartment project analyzed in the EIR and would not result in new or substantially more severe impacts to biological resources. The addendum proposed revisions to some of the mitigation measures, including requiring the survey for nesting raptors and other migratory birds by a qualified biologist to occur within *seven* days before beginning vegetation removal or construction during nesting season, with a resurvey if vegetation removal or construction was delayed more than seven days.

In response to the addendum, Save Lafayette provided a letter by an ecologist, Shawn Smallwood, Ph.D., commenting on the project's effects on biological resources. Dr. Smallwood reported that he visited the project site in May 2020. He saw 23 species of birds, five of which are special-status species. Specifically, he saw osprey flying over the site, a white-tailed kite foraging on the project site for extended periods, and two red-tailed hawks foraging, and he heard the calls of a Cooper's hawk and an olive-sided flycatcher. He also reported: the project site included riparian woodland that appeared suitable habitat for the dusky-footed woodrat; a creek likely served as a movement corridor for the red-legged frog, a California threatened species; multiple special-status species of bats likely roosted in trees on the site and used the riparian corridor for movement; and other special status terrestrial species, including the American badger and the Western pond turtle, likely used the project site. According to Dr. Smallwood, 42 special-status bird species had been detected nearby or within the region of the project site, as had 10 special-status species of mammals, reptiles, or amphibians. He opined that the EIR and the addendum did not address the potential for loss of habitat provided by the mature trees that would be removed under the project and the loss of breeding territory for birds. And he

26

expressed concern that birds would be killed by colliding with windows, for which he proposed mitigation measures.

Save Lafayette contends the EIR's discussion of special-status species did not comply with CEQA's mandate that an EIR provide the information necessary for informed decisionmaking and informed public participation.  In light of Dr. Smallwood's observations, the EIR was incorrect, as was the 2020 addendum, in stating there were no special-status species on the project site, Save Lafayette contends.  (See *Ocean Street Extension Neighborhood Assn. v. City of Santa Cruz* (2021) 73 Cal.App.5th 985, 1004.)  In the alternative, Save Lafayette treats the presence of five protected species either seen at or heard from the project site as new information that required consideration in an SEIR.

We disagree with both arguments.  The EIR specifically contemplated that protected species may use the project site for foraging and perhaps for nesting and roosting, although none were seen there in 2013.  The EIR proposed measures to mitigate any harm, measures the addendum strengthened.  Consistent with the possibility that special-status birds might use the site, Dr. Smallwood observed or heard such species at or near the site when he visited in 2020.  But there is no indication they inhabited or nested at the site, merely that they were nearby, flew over it, or foraged there.  To the extent Save Lafayette challenges the adequacy of the analysis, we disagree, concluding the EIR fulfills its role as an informational document because it anticipates the occasional presence of special-status bird species even though it did not report any actual sightings.  To the extent Save Lafayette critiques the factual support for the EIR's conclusions and the City's decision to proceed by way of addendum rather than through an SEIR,

27

those are questions we review for substantial evidence, and such evidence is present here.

Save Lafayette also points to Dr. Smallwood's conclusion that the site, particularly the riparian woodland of the creek, contains habitat suitable for a number of special-status species. And, Save Lafayette points out, Dr. Smallwood expressed concern that birds would collide with windows at the project and he proposed mitigation measures. But these concerns do not fall within any of the categories justifying the preparation of an SEIR—substantial changes to the project, substantial changes in circumstances, or "[n]ew information, which was not known and could not have been known at the time the environmental impact report was certified as complete." (§ 21166.)

We are unpersuaded by Save Lafayette's reliance on *Banning Ranch Conservancy v. City of Newport Beach* (2017) 2 Cal.5th 918 (*Banning Ranch*). The project at issue there was in the coastal zone, subject to the requirements of the California Coastal Act of 1976 (§ 30000 et seq. (Coastal Act)) that areas designated environmentally sensitive habitat be protected against significant disruption in habitat values, and that development in adjacent areas be designed to prevent impacts that would degrade them. (§ 30240, subds. (a), (b); *Banning Ranch*, at p. 926.) Although there were Environmentally Sensitive Habitat Areas on the project site, the EIR did not discuss the subject in detail and omitted any analysis of the Coastal Act's requirements for such areas. (*Banning Ranch*, at pp. 930, 932–933, 937.) The court concluded this discussion was inconsistent with CEQA's requirements that an EIR integrate CEQA review with the requirements of the Coastal Act, consider regionally significant impacts in a regional context, and evaluate project alternatives and mitigation measures. (*Banning Ranch*, at pp. 936–

28

938).  By failing to account for the Coastal Act's specific protections, the EIR fell short.  (*Banning Ranch*, at p. 941.)  But the project site before us does not implicate the Coastal Act, and Save Lafayette has not identified any other environmental statute or regulatory scheme the EIR should have addressed.  Nor did the EIR here ignore the possibility that special-status species might use the project site; rather, it expressly took that possibility into account and adopted mitigation measures to address it.

Nor do the other cases upon which Save Lafayette relies establish that an SEIR was necessary.  The project in *Mira Monte Homeowners Assn. v. County of Ventura* (1985) 165 Cal.App.3d 357, as originally proposed, would place residential lots within or directly adjacent to wetlands; it was then revised to eliminate the encroaching lots, and the review continued on the assumption the development would not encroach on the wetland area.  (*Id.* at p. 360.)  After an EIR was prepared but before it was certified, it was discovered that a portion of the project would encroach on the wetlands.  (*Id.* at pp. 360–361.)  This discovery, the appellate court concluded, was a change in circumstances that required preparation of a subsequent or supplemental EIR before project approval, and by failing to prepare one, the county did not consider the full range and effectiveness of alternatives and mitigation measures.  (*Id.* at pp. 364–365.)  Here, in contrast, the EIR contemplated that special-status species might be found on the project site, and it proposed mitigation measures.

*Moss v. County of Humboldt* (2008) 162 Cal.App.4th 1041, 1066 is also of limited utility to Save Lafayette.  The question there was whether the evidence supported a county's decision to *require* further environmental review when the presence of a trout species of special concern had only recently been brought to its attention.  The court resolved doubts in favor of

29

the county and concluded substantial evidence supported its decision.  (*Ibid*.)
The situation here is reversed, as the City declined to require further
environmental review.

Save Lafayette also points to *Sierra Club v. Gilroy City Council* (1990)
222 Cal.App.3d 30 (disapproved on another point in *Western States Petroleum
Assn. v. Superior Court* (1995) 9 Cal.4th 559, 570, fn. 2, 576, fn. 6), but that
case does not assist it.  The EIR for a housing development analyzed the
project's potential to affect the habitat of the California Tiger Salamander,
which had been observed nearby, and proposed measures to mitigate any
impact on California Tiger Salamanders.  (*Sierra Club*, at p. 37.)  The
appellate court rejected a project challenger's contention that the later
discovery of the species on the site required an SEIR, as the issue had
already been thoroughly analyzed in the final EIR.  (*Id*. at pp. 45–46.)  In the
EIR before us, the discussion of special-status species was not as robust, but
the document considered the possibility that such species would be present at
the project site when construction began, and it proposed measures to
mitigate this impact.

We thus conclude the EIR was adequate as an informational document,
and the record contains substantial evidence to support the City's
determination under section 21166 that there were no substantial changes in
the project or its circumstances requiring major revisions to the EIR, nor new
information of substantial importance regarding the project's effects on
wildlife.

### E. Wildfire Risks

Save Lafayette next challenges the adequacy of the environmental
review of the project's effects on wildfire risks.  The CEQA Guidelines'
appendix G checklist indicates that a project's impact would be significant if

the project would " 'impair implementation or physically interfere with an adopted emergency response plan to emergency evacuation plan.' " (See *League to Save Lake Tahoe v. County of Placer* (2022) 75 Cal.App.5th 63, 133 (*Tahoe*).)

### 1. *EIR's Discussion of Wildfire Risks*

The 2013 EIR for the apartment project considered whether the project would expose people or structures to significant risk from wildland fires. In a one-paragraph discussion, the EIR explained that CalFire includes the City in its list of cities containing Very High Fire Hazard Severity Zones (VHFHSZ), but that the project site did not include any areas designated Very High risk. According to the EIR, the entire project site was in a " 'High' risk zone" and, under the City's general plan, the applicant would be required to prepare a City-approved vegetation management plan that included native, drought-tolerant, and fire-resistant species. And mandatory compliance with the California Building Code, which included a requirement for automatic sprinkler systems, would further prevent or reduce the risk to people or structures from wildland fires.

The EIR also concluded the project would not have a significant impact on an emergency response plan or emergency evacuation plan, explaining that the project's internal roadway system would provide residential and emergency access, that a mitigation measure would ensure turning radii were provided on-site, and that vehicles would use three entrance points to the project site. Therefore, according to the EIR, "the Project would not impair implementation of[,] or physically interfere with[,] the *City of Lafayette's Emergency Operations Plan*, which addresses . . . natural disasters, including wildfires[,] and associated impacts would be *less than significant*."

31

## 2. *Addendum*

By the time the project was resumed, the addendum reported that the site's designation had changed.  The site was now within the VHFHSZ on the City's adopted map, which depicts data compiled from the Contra Costa County Fire Protection District fire hazards map and CalFire.  Fire risks were "Very High" because the semi-rural character of the project site, involving a mix of population with the vegetation and open spaces of a rural environment, was subject to wildland fires that could cause loss of life and property.

The addendum included a discussion of evacuation in the event of fire.  The project site is located along the eastern limits of Zone 3 of the City of Lafayette Emergency Operation Plan.  Pleasant Hill Road would serve as the primary evacuation route for the project but, depending on conditions on Pleasant Hill Road, Deer Hill Road could also be used.  The resumed project included mitigation measures to ease traffic flow, including during emergencies, and the addendum reported that with these measures the project would not adversely affect the operations and emergency response of the Lafayette Police Department or the Contra Costa County Fire Protection District.  Moreover, the fire protection district would review the project to ensure adequate emergency access as part of the project's permitting approval.

## 3. *Comments and Further Reports*

Save Lafayette raised concerns that the project would increase traffic delays for existing residents in the vicinity if it were necessary to evacuate due to fire.  Members of the public also pointed out that a major fire had recently taken place at the Lafayette Tennis Club.

TJKM, the traffic consultant that had assisted with the EIR and the addendum, prepared a memorandum addressing concerns about emergency evacuation. The memorandum, dated June 22, 2020, concluded that by increasing roadway capacity with the addition of a "through" lane at Pleasant Hill Road and Deer Hill Road/Stanley Boulevard and a "trap" lane for an on-ramp onto Highway 24, the project would improve existing evacuation operations, more than compensating for the additional traffic generated by the project.

Thomas J. Cova, Ph.D., a professor in the Department of Geography at the University of Utah, provided comments on the project's potential effects on emergency evacuation. He opined that the area could experience fast-moving fires that left little time for an orderly evacuation, that Pleasant Hill road, the primary means of egress for communities north of Highway 24, was likely to become congested during an evacuation, and that the addition of new residents would "of course" cause delays in evacuation for residents to the north of the project site. He said the issue required further study. There is no indication he had reviewed the TJKM report.

Save Lafayette provided a memorandum by a consultant, Lin Zhang, Ph.D., of the Elite Transportation Group, who reviewed TJKM's emergency evacuation modeling and analysis.[5] Dr. Zhang opined that TJKM's models were flawed. His models showed that in an evacuation, a large number of vehicles (3,400 with a trap lane and more than 3,800 with no trap lane)

---

[5] This memorandum, dated August 23, 2020, says it was made in part to respond to a TJKM memorandum dated August 10, 2020. Save Lafayette does not tell us where in the voluminous record an August 10 report may be found, and we decline to search for one. (See *Del Real v. City of Riverside* (2002) 95 Cal.App.4th 761, 768 [appellate court need not search record on its own seeking error].)

would be "denied entry," or unable to get onto the streets for evacuation during the morning peak hours of 7:00 to 8:00 a.m., and that from the project site, only two percent of vehicles (assuming no trap lane) or 30 percent (assuming a trap lane) would be able to enter the roadways.

> ### 4. Analysis

Save Lafayette makes two primary challenges to the wildfire risk analysis in its opening brief. First, it argues the EIR was insufficient as an informational document because after the EIR was certified but before the project was approved, the City adopted a resolution redesignating the project site VHFHSZ. This redesignation, Save Lafayette argues, necessitated an evacuation analysis. Second, it contends, the redesignation constituted a changed circumstance and significant new information requiring preparation of an SEIR. These contentions rest in part on a factual mistake and on a separate misreading of the EIR.

First, the factual mistake: the City adopted an ordinance redesignating the project site VHFHSZ on June 24, 2013 (apparently at a meeting at which the City Council also considered the certification of the EIR), and the ordinance became effective 30 days later. The EIR was certified on August 12, 2013, several weeks *after* the redesignation went into effect, contrary to Save Lafayette's assertion in its opening brief that the site was redesignated after the EIR's certification. Respondents' brief pointed out this mistake, and in its reply brief, Save Lafayette pivots to arguing that the 2013 EIR was inadequate as an informational document, not only because the VHFHSZ designation necessitated a wildfire evacuation analysis but also because its error in stating the project site was not in a VHFHSZ zone rendered the description of the environmental setting inaccurate.

34

Second, Save Lafayette misreads the EIR as concluding wildfires were not a significant risk *because* "the Project does not include any areas designated as 'Very High' risk." The clear implication is that the EIR's analysis ended there, but that is a gross oversimplification of the EIR. While the EIR incorrectly noted the project site itself was not designated " 'Very High' " risk, the EIR also explained that CalFire included the City in its list of those with VHFHSZ's, and that the entire project site was designated a " 'High' risk zone." And, it went on, the applicant would be required to prepare a City-approved vegetation management plan with drought-tolerant and fire-resistant plantings,[6] to install automatic sprinklers as required by the California Building Code, and to submit to the Contra Costa County Fire Protection District's plan review. *Those factors*, not the simple lack of a VHFHSZ designation, rendered impacts associated with wildfire risk less than significant. And, as discussed above, the EIR examined whether the project would interfere with emergency response and evacuation plans, concluding that with planned mitigation it would not.

Neither Save Lafayette nor anyone else appears to have objected to the EIR before it was certified on the ground that its wildfire risk discussion was inadequate.[7] Save Lafayette's argument now is based largely on the change

---

[6] On our own motion, we take judicial notice of Policy S-4.5 of the City's general plan, which requires such vegetation management plans for developments in high-risk fire areas.

[7] Without detailed analysis, respondents suggest a challenge to the 2013 EIR on this ground is barred for failure to exhaust administrative remedies. Because the adequacy of the wildfire evacuation analysis was raised before the public hearing at which the project was approved, we will not treat this challenge as forfeited. (See *Bakersfield Citizens*, *supra*, 124 Cal.App.4th at pp. 1200–1201; *Galante Vineyards v. Monterey Peninsula Water Management Dist.* (1997) 60 Cal.App.4th 1109, 1121.)

in designation of the project site to a "Very High" fire risk zone. To the extent Save Lafayette continues to maintain its position that this redesignation, in itself, constitutes significant new information or creates a changed circumstance requiring an SEIR, we are unpersuaded. Courts analyzing whether new information necessitates an SEIR look to the physical characteristics of a site and the actual environmental effects of a project, not to mere regulatory changes. For example, when CEQA Guidelines changed and began requiring consideration of greenhouse gas emissions, citizens' groups were unsuccessful in demanding that SEIRs be prepared to address the subject. (See, e.g., *Citizens Against Airport Pollution v. City of San Jose* (2014) 227 Cal.App.4th 788, 806–808 (*CAAP*); *Citizens for Responsible Equitable Environmental Development v. City of San Diego* (2011) 196 Cal.App.4th 515, 531–532 (*CREEP*).) The regulatory requirement may be new, one court explained, but "the potential environmental impact of greenhouse gas emissions has been known since the 1970's." (*CAAP*, at p. 807; see also *CREEP*, at p. 531 ["An SEIR is not required absent new information, and . . . information on the effect of greenhouse gas emissions on climate was known long before the City approved the 1994 FEIR"].) So, here, though the VHFHSZ designation was at some point new, there is no new information about the physical environment that Save Lafayette points to as necessitating a new or more detailed analysis than when the property was still included in a "High" risk zone.

Nor do we agree with Save Lafayette's argument that the redesignation rendered the description of the environmental setting so deficient as to make the EIR inadequate as an informational document. A description of the environmental setting must describe "the *physical* environmental conditions in the vicinity of the project." (Guidelines, § 15125, subd. (a), italics added.)

36

Although the designation of the project site had changed between the time the EIR was prepared and its certification, there is no indication the EIR inaccurately described the physical conditions. It described the area as in a "High" risk zone and in the same city as "Very High" risk zones, it explained how that risk would be reduced, and, in the section considering emergency response plans and evacuation plans, it explained why emergency vehicle operations would not be impaired and that vehicles would use the internal roadway system and three entrance points. We are not persuaded that the EIR failed as an informational document because it did not include a quantitative analysis of evacuation times, or because it did not reach the same conclusions as Dr. Zhang.

Save Lafayette relies on *Newtown Preservation Society v. County of El Dorado* (2021) 65 Cal.App.5th 771, but that case does not assist it. A county there prepared a mitigated negative declaration (MND) rather than an EIR for a project, explaining that there would be road closures during construction, that the county would coordinate with the sheriff's emergency services office and the county's fire protection district to maintain access to all residences, and that there would be a specified temporary evacuation route. (*Id*. at pp. 775–777.) In response to comments, the county explained further that if a fire blocked a particular road, the emergency services office would use other options, listing several possible evacuation routes. (*Id*. at pp. 778–779.) The appellate court rejected a contention that the county should have prepared an EIR to examine the project's effects on an existing escape route from the project area, relying in part on the fact that the emergency services office and the fire department, which had expertise in emergencies and evacuation, " 'were comfortable' " with the county's proposal. (*Id*. at p. 789; see also *Clews Land & Livestock, LLC v. City of San Diego*

37

(2017) 19 Cal.App.5th 161, 176, 194 [rejecting challenge to MND for school in VHFHSZ when emergency evacuation plan described two evacuation routes, and school would close on red flag warning days].)  The question here is not whether an EIR should have been prepared but whether the EIR was adequate.  *Newtown* refutes the contention that the EIR here is deficient because it lacked quantitative analysis.  Whether or not a such an analysis would have been useful (see *Tahoe*, *supra*, 75 Cal.App.5th at p. 137 [finding evacuation analysis adequate in part based on modeling of evacuation time]), the EIR contained sufficient information and analysis to allow the public to discern the City's analytical route in approving the project (*id.* at p. 139).  (See also *Tiburon*, *supra*, 78 Cal.App.5th at p. 754 [" 'That further study . . . might be helpful does not make it necessary' "].)

In reaching this conclusion, we do not quarrel with Save Lafayette's argument that *if* the EIR is inadequate as a matter of law, the TJKM analysis—which was not the basis for or included in a circulated EIR or SEIR—cannot save it.  As recently explained in *Sierra Watch v. County of Placer* (2021) 69 Cal.App.5th 86, 103, "to the extent an agency omits an adequate discussion of a project's potential impacts in its EIR, it cannot afterward 'make up for the lack of analysis in the EIR' through post-EIR analysis."  But Save Lafayette has not shown the EIR was inadequate when it was certified in August 2013.  And TJKM's analysis is relevant to whether the City's decision to proceed with an addendum rather than with an SEIR is supported by substantial evidence.

Save Lafayette has not shown that substantial changes or new information necessitated an SEIR to address the project's effect on emergency response and evacuation plans.  Although Dr. Cova raised concerns about the effect of the project on evacuation times and Dr. Zhang challenged TJKM's

analysis, the TJKM report concluded that the project's additional roadway capacity would actually *improve* evacuation times. This is substantial evidence supporting the City's finding that the EIR's emergency response and evacuation discussion was adequate, and no intervening changes or new information required major revisions to the EIR. (§ 21166.)

Save Lafayette objects that the TJKM report cannot act as substantial evidence because it was "based on false statements." At a city council meeting on August 10, 2020, a TJKM employee testified that, when considering how students from nearby schools would be evacuated in an emergency, she called County Connection to ask where the necessary buses would come from and how big their buses were. She continued, "And basically they didn't indicate that there would be any problem at all getting this number of buses from their yard." Her statements, Save Lafayette contends, were "utter fabrications," contradicted by a letter from the General Manager and CEO of County Connection, who said no one on his staff could recall speaking with anyone about the project, and that its ability to respond to an emergency would depend on factors such as traffic, the nature of the emergency, the distance, and how quickly County Connection could organize its employees. At a later city council meeting, the TJKM employee testified that she had found notes of her conversations with a County Connection employee, who told her during a brief conversation the size of the buses and where they would be likely to come from, but that she had not received a specific commitment to send buses. Her cell phone bill reflected calls to and from County Connection.

Save Lafayette suggests this is a discrepancy that casts doubt on TJKM's credibility and all of its analysis, and the City should therefore have disregarded TJKM's report. For this proposition, it relies on *Bowman v. City*

*of Berkeley* (2004) 122 Cal.App.4th 572, 582–583, which concluded an agency was within its discretion to discount the credibility of an expert who had made misrepresentations. We reject the implication that the discrepancy between the TJKM employee's statements and the recollection of County Connection employees compelled the City to reject TJKM's traffic analysis. The discrepancy can easily be seen as a failure of recollection on the part of County Connection employees that does not cast doubt on the reliability of TJKM's analysis, and the City was well within its discretion to rely on that analysis.

### F. Tree Removal

The EIR explained that the project would require removal of 91 of the 117 trees on the project site that qualified as " 'protected trees' " under the City's tree protection ordinance, among them a large valley oak with a 58-inch diameter, which was more than 200 years old. As specified in the Tree Protection Ordinance, replacement trees would have to be planted. Avoiding the felling of protected trees would have required a major redesign of the project, and the EIR treated the impact after mitigation as significant and unavoidable.

The 2020 addendum reported that the resumed project would remove ten more trees than the project originally proposed, or a total of 101 trees, thus preserving 16 instead of 26 trees. As mitigation, 68 more replacement trees than the 700 originally planned would be planted, for a total of 768 new trees. With implementation of this mitigation measure, the addendum concluded, impacts on tree resources would be similar to those identified in the 2013 EIR, with no new or substantially more severe significant environmental impacts that would conflict with applicable land use plans,

policies or ordinances.  The impact remained significant and unavoidable even after mitigation.

Save Lafayette argues that removal of the additional ten trees creates a substantially more significant environmental impact requiring preparation of an SEIR, and that the EIR is inadequate as an informational document because it does not contain an " 'accurate, stable, and finite project description.' "  (See *County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 193.)  As we have explained, CEQA contemplates that changes in a project might occur after an EIR is certified, and it limits the circumstances in which an SEIR must be prepared.  (§ 21166.)  We are unpersuaded that the change at issue here renders the project description inaccurate.  The proper question before us is whether substantial evidence supports the City's determination that none of the conditions necessitating an SEIR are present.  (See Guidelines, § 15164, subd. (e); *Mani Brothers*, *supra*, 153 Cal.App.4th at p. 1397.)

This record is sufficient to support that determination.  As originally contemplated, the project included removing most of the trees on the site, including a large valley oak that was more than 200 years old, and the impact would be significant even after mitigation.  Under the resumed project the valley oak and other oaks to the southeast would still be removed, rendering the impact still significant and unavoidable, but mitigation in the form of tree replacement would increase in compliance with the City's Tree Protection Ordinance to account for the additional trees now also being removed.  Substantial evidence supports a conclusion that the changes to the project are not so substantial as to require "major revisions" of the EIR. (§ 21166, subd. (a).)

41

Save Lafayette relies on *American Canyon* to argue otherwise, but its reliance is unavailing. (*American Canyon*, *supra*, 145 Cal.App.4th 1062.) The *American Canyon* court held further environmental review was necessary where a mitigated negative declaration for a three-component project had previously been adopted; there was a 6.5 percent increase in the size of the retail component of the project, a big box store; the city's zoning ordinance treated a five percent increase in the square footage of an approved structure to be a major modification of a project; and the city inexplicably excluded some of the building area from the square-footage analysis when evaluating changes to the size of the retail component. (*Id.* at pp. 1067–1068, 1075–1077.) Here, in stark contrast, the EIR analyzed the effect of removing trees, the addendum acknowledged that 10 more trees would be removed than earlier contemplated and that the impact remained significant after mitigation, and changes to the project complied with local ordinance by requiring additional trees to be planted. *American Canyon* does not persuade us that an SEIR is necessary to study the effects of removing 10 additional trees.

In sum, Save Lafayette's challenges under CEQA all fail. The EIR was adequate as an informational document, although it lacked the information Save Lafayette subsequently developed about special-status species and about wildfire risks, and although the project description changed to include the felling of additional trees. Nor has Save Lafayette shown that an SEIR was required to address new information.

## DISPOSITION

The judgment is affirmed.

42

TUCHER, P.J.


WE CONCUR:


FUJISAKI, J.
PETROU, J.


*Save Lafayette v. City of Lafayette et al.* (A164394)


43

Trial Court:        Contra Costa County Superior Court

Trial Judge:        Hon. Barry Baskin

Counsel:            Louzeau Drury, Richard Drury, Rebecca Davis, Victoria
                    Yundt; and Lason, Scott Sommer for Plaintiff and
                    Appellant

                    Coblentz, Patch, Duffy & Bass, Jonathan R. Bass,
                    Katharine Van Dusen, and Robert B. Hodil for
                    Defendants and Respondents

                    Miller Starr Regalia, Arthur F. Coon, Bryan W. Wenter,
                    Matthew C. Henderson for Real Party in Interest.